Lena Esderts, Administratrix of the Estate of William J. Esderts, Deceased, Plaintiff-Appellant, v. Chicago, Rock Island & Pacific Railroad Company, a Corporation, Defendant-Appellee.

Gen. No. 49,400.

First District, Third Division.

July 14, 1966.

James A. Dooley, of Chicago, for appellant.

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (Charles M. Rush and John M. O'Connor, Jr., of counsel), for appellee.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

The administratrix of the estate of William J. Esderts, brought this action against the defendant, Chicago Rock Island & Pacific Railroad Company, based upon the Federal Employers' Liability Act (45 USCA § 51, et seq.). The jury returned a verdict in the defendant's favor, judgment was entered thereon and the plaintiff appeals.

The plaintiff contends that she was deprived of a fair trial because improper procedure was followed in the use of impeaching statements in the cross-examination of one of the plaintiff's witnesses, because the trial court re-called the jury after proofs were closed and read these statements to the jury, and because of prejudicial argument by the defendant.

William Esderts was the foreman of a bridge-repair crew employed by the defendant. The crew had spent a few weeks in Iowa Falls, Iowa, repairing a bridge and were using three railroad cars for their headquarters, one of which was their bunk car. The three cars were on a switch track just south of the railroad's single-track main line which ran east and west through Iowa Falls. There were other switch tracks to the north of the main line. The bridge was on the main line three-quarters of a mile west of the bunk car.

In the late afternoon on June 5, 1952, Esderts, who had been employed by the railroad for nearly 20 years, Wilbur Peet, a young man and a new employee, and another employee who was also doing the cooking for the crew, left the bridge by a motorcar, which ran on the railroad tracks, and rode to the bunk car so that Peet could fill out some papers required for his employment and the other employee could prepare the evening meal. They traveled eastward over the main line and upon reaching the bunk car the motorcar was removed from the main line so that it would be out of the way of an expected passenger train; it was placed on the switch track to the south but it was not turned around. The front end was still facing east and the rear end was to the west.

The motorcar was a small flat car which could carry four men. The men would sit sideways on the platform of the car, two on one side and two on the other, back to back, facing away from the tracks on which the car rode. There were footboards for their feet and there was a canvas windbreak on the front end of the car. The operating levers were in the center of the platform and the man who ran the car would turn his body at an angle so that he could see ahead and reach the levers with that hand which was toward the inside of the car.

After Peet had completed his forms, Esderts and he reboarded the car to pick up the rest of the crew at the

bridge. Peet sat on the south side with his body turned towards the west, the direction in which the car was to go; he was leaning against the metal bars which supported the windbreak which was to the east and back of him. Esderts sat on the north side of the car with his upper body and face turned to the west and his right hand operating the controls behind his back. They then proceeded westward on the switch track, the car being run backwards contrary to the rules of the railroad.

The switch track entered the main line some distance to the west. 216 feet east of where the junction took place there was a derail device located on the south rail of the switch track. This was a safety device, the principal purpose of which was to prevent cars on the switch track from entering the main line and colliding with passenger or other trains. The derail would deflect cars to the south and away from the main line. Derails were painted yellow and there were such devices on all the switch tracks of the defendant railroad. The rules of the railroad required the devices to be set for their intended purpose. The derails were locked to the tracks and had to be unlocked by hand to permit movement of cars onto main tracks. The railroad rules required track foremen to watch the derails and to reset them if they were in a wrong position. The derail on the south switch track was locked and Esderts had a key for it.

As the motor car went westward at five to eight miles per hour, an eastbound switch engine on a track north of the main line passed by. Peet turned his head to the right and waved to a man on the engine. Esderts and the foreman of a switch crew waved to each other, too. A moment later the motorcar struck the derail and was hurled from the tracks. Esderts was flung off backwards and the car landed on top of him. Peet, who was thrown clear, removed the car from Esderts, who, while in obvious pain, was not unconscious. Other railroad men

working in the yard came to help, a doctor was called and Esderts was taken to a hospital where he died the next day.

Although there was little dispute as to the manner in which the accident occurred, there were disputes concerning the scene of the accident. There was a warning sign on a four or five-foot high post located about six feet south of the derail. The post had the word "DE-RAIL" painted vertically on its east and west sides. One dispute concerned the legibility of this sign, whether it needed painting and whether it was obscured by weeds. Another dispute pertained to the visibility of the derail device, whether it was painted yellow or whether it was the same rusty color as the rail. Still other disputes concerned the weeds between the rails of the switch track, the weeds to the south of the track and the presence of debris between the rails and in the general area. All these issues, which the jury resolved favorably to the defendant, were pertinent under the plaintiff's complaint which alleged that the defendant had carelessly and negligently:

a. maintained, operated and controlled a certain track and derail device in such a manner as to create a dangerous and hazardous condition to railroad employees required to use the track;

b. failed to provide plaintiff's decedent with a safe place to work;

c. permitted weeds, grass and foreign growth to accumulate around the derail device so as to obscure the presence of the device from plaintiff's decedent;

d. failed to post adequate signs or otherwise to warn plaintiff's decedent of the presence of the device;

e. allowed and permitted a certain derail device to remain in close proximity to a passing truck and

216

in a concealed location so as to create a hazard and trap for railroad employees using said track.

The Federal Employers' Liability Act provides that a railroad will be liable for any injury or death to an employee of such carrier resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment. The Act further provides that contributory negligence on the part of the injured employee will not bar the action, but the damages will merely be diminished by the jury in proportion to the amount of negligence attributable to such employee.

■ It is our opinion from reading the entire record that it was not unreasonable for the jury to reach the conclusion that it did. The evidence, although in conflict, was sufficient for the jury to find that no negligence of the railroad contributed wholly or partially to Esderts' injury and death. The plaintiff contends, however, that the jury's verdict was improperly influenced by errors which took place during the trial, and that these errors were compounded by the prejudicial argument of the defendant's counsel.

The alleged trial errors pertain to the defendant's use and the trial court's treatment of post-accident statements signed by Wilbur Peet who was the only person who saw the accident and who testified as a witness for the plaintiff. The errors charged are many and the principal ones pertaining to the defendant's use of statements are these: the entire statements were introduced into evidence, read to the jury and used as substantive, not impeaching, evidence; the portions of the statements which may have been impeaching were never offered in evidence; Peet was questioned on irrelevant matters for which there was no basis for impeachment and was

217

interrogated for the deliberate purpose of impeaching him; the whole intent in the cross-examination of Peet was to generate the impression that his testimony was contradictory to his statements and to put him and the plaintiff in a bad light in the eyes of the jury; the defendant succeeded in this purpose by the questions it asked, by the way it asked them and by causing the plaintiff to object to them, and that the defendant's mode of handling the statements prevented the plaintiff from challenging their impeachment character and from offering explanatory or rebuttal evidence. The errors laid at the door of the trial judge are the following: telling the jury that the full statements would be given to them and ruling that the statements would go to the jury room; recalling the jury after they had commenced deliberating and reading the statements to the jury himself, and creating an unfair dilemma for the plaintiff by ruling that the complete statements would go to the jury room unless the plaintiff agreed to his reading them to the jury. Although this truncated list of errors appears formidable, it becomes less so when the errors are evaluated in conjunction with what actually took place at the trial.

For a better understanding of the errors alleged and the trial developments, a resume of relevant parts of Peet's testimony and statements is advisable. Peet testified that Esderts did not wave to anyone when the switch engine passed by, that the speed of their motorcar was approximately five miles per hour, that the derail device looked just like the track, that weeds between the tracks were eight to twelve inches high, that the derail sign was fourteen feet south of the track, had little paint on it, was not over four feet high and that the top of the post could not have been more than six inches above the weeds. During his cross-examination Peet was questioned about three signed statements. The first was made by him the day after the accident, June 6, 1952, and was

marked defendant's exhibit #4. This exhibit was three pages in length and, except for three sentences, was fully corroborative of his testimony. These sentences were: "I do not know if my Foreman waved . . . or not," ". . . we were traveling in my judgment about 7 or 8 miles an hour. . . ." and ". . . the track itself was not the cause of our derailment." The second statement was made four days later, June 10, 1952, and was marked defendant's exhibit #12. It was in question and answer form and three of the questions and answers were these:

"Q. Did Foreman Esderts wave at the fireman on the switch engine?

"A. I did not see him wave . . . I did not see Bill wave.

"Q. How fast were you moving when you struck this derail?

"A. About seven or eight miles an hour.

"Q. Was there anything to obstruct the view of either the derail or the derail sign from your position on the motorcar?

"A. The sun was shining in my eyes and I didn't see it."

The third was made five years later, October 10, 1956, and was marked defendant's exhibit #11. It consisted of two paragraphs. In it Peet said that he had no recollection of the derail or sign being painted or weeds being cut following the accident. Pictures of the scene (which were subsequently introduced in evidence at the trial) were shown to him when the statement was taken and he said the pictures "show the conditions as they were at the time of the accident."

With this background we can now relate what took place at the trial. After Peet identified his signature on exhibit 4 the plaintiff objected to any questions concerning the contents of the statement on the ground that

219

a signed statement, for which the proper foundation had been laid, could only be used for impeachment purposes during the defendant's side of the case when it could be introduced in evidence and the impeaching portions read to the jury. The court sustained the objection. Later on in cross-examination the defendant's attorney with exhibit 4 in hand, asked Peet three or four times if it was true that he did not know whether or not Esderts waved. As each question was asked the plaintiff repeated the objection that a wrong method was being used to impeach from a signed statement. The form of the last question was changed and Peet answered that he was quite certain that Esderts did not wave. Only two other questions which might have been founded on exhibit 4 were asked the witness: one was about the speed of the motorcar and the other was about the time intervening between Peet's waving to the switch engine and striking of the derail; objections to these questions were sustained.

After being shown exhibit 11 Peet said it was not his statement but that it bore his signature. The defense attorney started to ask a question about the exhibit and the plaintiff's attorney objected before the question was completed. The objection was on the ground that the witness could not be impeached by showing that he did make the statement or on any collateral or immaterial matter. A discussion took place in chambers during which the statement was shown to the attorney who thereupon withdrew his objection. The defendant, however, asked no further question of the witness based on the statement. However, he was asked questions, without objection, concerning subjects covered in the statement. He said that following the accident the position of the derail sign had been changed and the whole yard had been cleaned. He was also shown pictures of the scene, presumably the same ones shown him at the time he made the statement.

Peet was also questioned about exhibit 12 and the inquiry was made whether the questions and answers, which we mentioned heretofore, were asked and answered as set forth in the statement. Although exhibit 12 was a signed statement the plaintiff did not repeat his general objection. A specific objection was made to the question: "Was there anything to obstruct the view of either the derail or the derail sign from your position on the motor car?" for the reason that it was not impeaching. The objection was overruled. No objection was made to the other two questions. The witness replied that he was not sure he had made the answers as they were written. The person who took the statement testified that the questions had been asked and the answers given as set out in the exhibit.

At the conclusion of the defendant's case only exhibit 12 was offered in evidence. In the presence of the jury the plaintiff asked: "What about the other statement?" and "I am asking you what about the statement you had him identify and laid a foundation for." The defendant then offered exhibit 11. The plaintiff persisted, "But where is the statement which you had marked for identification which Mr. Peet signed on June 6, 1952?" The jury was excused. The attorney for the plaintiff pursued his inquiry and twice stated that he would offer exhibit 4 if the defendant did not. The defendant finally offered it and it was received in evidence. The defendant, however, did not read into evidence the impeaching portions of exhibit 4 or of exhibit 11.

During his final argument the defendant's attorney referred to exhibit 4 two times but did not read from it; he told the jurors that it was in evidence and that they would have the opportunity to read it. In his closing argument the plaintiff's attorney said that since the defendant had not read the statement he would do so. The defendant stated that he had no objection if the entire statement was read; the plaintiff replied that he

intended to read the statement completely. As he read it he interspersed frequent observations that the statement substantiated Peet's testimony. He read all of the statement except the last five sentences which included the one about the switch track itself not being the cause of the derailment. The defendant protested the omission. The court responded that the statement was in evidence and the jury could read it in its entirety in the jury room.

In his final argument the defendant's attorney referred to exhibit 11, which he said the jury would see in the jury room, and called attention to what Peet had said in his statement. The plaintiff's attorney also talked about the statement and he read that portion of it wherein Peet said that he knew nothing of painting being done or weeds being cut following the accident. He did not read the part wherein Peet stated that the defendant's pictures showed the conditions as they were at the time of the accident.

Exhibit 12 was also referred to in the defendant's final argument, and the questions asked of Peet and the answers made by him in that statement were repeated. The plaintiff in rejoinder only mentioned the question and answer concerning Esderts' waving to the switch engine.

After the jury had been instructed and had retired, the attorney for the plaintiff objected to exhibits 4 and 11 going to the jury room because they were impeaching documents. The court reminded him that he had used exhibit 4 advantageously in corroboration of his own witness. The defendant's attorney argued that exhibit 4 had been offered at the insistence of the plaintiff, whose inquiry about the statement "put him on the spot" before the jury and made him appear like he was "holding something back," that the full statement had not been read and that the jury, having heard the parts favorable to the plaintiff, should see the entire statement. The plaintiff replied that the problem was created

by the defendant's failure to read the impeaching portions of the statement after introducing it and that to permit the statement to go to the jury would be reversible error. The plaintiff made an additional objection to exhibit 11: that in cross-examining Peet the defendant had gone beyond the scope of the direct examination and had asked him questions solely for the purpose of impeaching him.

During the heated discussion on both exhibits the situation was further complicated by a bailiff informing the court that the jury was asking for the exhibits. The court stated the exhibits would go to the jury. The plaintiff's attorney renewed his protest and the discussion continued. Cases were cited and read. The court remarked that he was not surprised that the jurors were looking for the statements after his telling them that they would have the statements to read. The court said that he was trying to avoid error and he proposed a solution: recalling the jury, reading the entire statements to them and not sending the statements to the jury room. He said it was a practical solution of the difficulty but that it could be done only be stipulation. The defendant's attorney agreed to the proposal but still contended that under the circumstances that had developed the exhibits should go to the jury room. The plaintiff's attorney voiced misgivings and advanced two objections: one was to the reading of that part of exhibit 4 about the switch track itself not being the cause of the derailment, and the second was that he did not want either counsel to participate in the reading. The judge suggested that he himself would read the exhibits but would not read the sentence objected to in exhibit 4. The plaintiff's attorney then agreed. The jurors were recalled and the judge told them that through inadvertence they had been told that the statements would accompany them to the jury room, that this could not be done and in

223

lieu of this he would read the statements to them. He did so with the exception of that part of exhibit 4 previously objected to by the plaintiff's attorney.

The defendant and the plaintiff must share responsibility for the irregular proceedings. The defendant was at fault in not following through with the impeachment process on exhibits 4 and 11 after the court sustained the plaintiff's objections to the method of impeachment being pursued by the defendant. There was a basis in law for the objections. It has been held that when it is desired to impeach a witness by a statement written or signed by him, and the proper foundation has been laid by permitting the witness to read the statement and proving by him or others that he wrote it himself, or that what he said was reduced to writing and was signed by him, the statement should be introduced into evidence during the cross-examiner's case and the portions contradictory to the witness' testimony read to the jury. Illinois Cent. R. Co. v. Wade, 206 Ill 523, 69 NE 565 (1904); Hapke v. Brandon, 343 Ill App 524, 99 NE2d 636 (1951). In the Wade case one of the parties sought to use written statements in this manner and the trial court would not permit it. The Appellate Court affirmed but the Supreme Court reversed holding that the course of proof pursued by the appellant was proper. In the Brandon case the trial court refused to admit into evidence written statements made by a witness inconsistent with his testimony. In reversing, the Appellate Court said that since the correct foundation had been laid it was proper to offer the inconsistent parts of the statements in evidence with other testimony on behalf of the appellant. We agree with the trial court in the present case that this is a proper method of using a written statement for impeachment purposes but we disagree that this is the only way it can be used. After the correct foundation has been laid a witness may be asked on cross-examination if he said this or that (quoting

from the statement) and if he denies the contradictions or says he was misquoted or the like, the follow-up proof may be the same as in the case of an oral statement, a deposition or prior testimony. If the witness admits having made the inconsistent statements a party is not foreclosed from making further proof, for it has been held that the party may prefer to have these statements more clearly brought out and emphasized. People v. Williams, 22 Ill2d 498, 177 NE2d 100 (1961). Contra: Sally Chain Stores, Inc. v. Ace Bonded Carriers, Inc., 307 Ill App 644, 650, 30 NE2d 966, 969 (1940). In the present case the trial court's ruling may have disconcerted the defendant; the cross-examination of Peet on exhibits 4 and 11 was curtailed and the full statements were offered in evidence reluctantly. But having started to impeach on these exhibits the defendant was at fault in not completing the impeachment even though the preliminary questions had not been fully answered. The defendant also was at fault in telling the jurors that they would have the statements in the jury room.

However, the plaintiff was not prejudiced because of these faults, in fact they redounded to the plaintiff's advantage. After prodding the defendant into introducing exhibit 4 under the threat of doing so if the defendant did not, the plaintiff's attorney capitalized on the defendant's failure to read the inconsistent parts of the statement and read most all of the statement himself. He read it because it was favorable to his client and repetitive of Peet's direct testimony. So, too, with exhibit 11. What he read to the jury, with one exception, was corroborative of Peet's testimony on cross-examination. He thus succeeded in repeating to the jury the testimony of his major witness through the use of statements that were otherwise inadmissible. As he stated in the plaintiff's brief: "His [Peet's] statements were exactly what he had testified to on direct examination."

The plaintiff complains that the entire statements were admitted into evidence, but she was more eager than the defendant that they be offered and received. She complains that the statements were read to the jury, but her counsel read the greater part of them himself and used them as substantive evidence in support of her case. She complains, on the one hand, that the impeaching portions of the statements were not read to the jury by the defendant and complains, on the other hand, that they were read by the court. As a matter of fact, her counsel read most of these himself. Of the three items in exhibit 4 which might be considered in conflict with Peet's testimony one (the track not causing the derailment) was never asked of Peet; and the other two (the speed of the motorcar and whether Esderts waved) were read by the plaintiff as well as the court. Moreover, the last two items were in evidence, long before exhibit 4 was read, through the medium of exhibit 12. Of the two conflicting items in exhibit 11 one (the weeds being cut after the accident) was read by both court and plaintiff; the second item (relative to the pictures correctly depicting the scene) was read by the court only. However, these pictures were in evidence and had been shown to Peet while he was on the witness stand. Because he said he did not know if they were the same ones he had seen when he made the statement, proof that they were identical was made by one of the persons present at the time he signed the statement. The repetition by the court could not have been seriously harmful to the plaintiff.

The plaintiff complains that she was precluded from challenging the impeaching character of the items in exhibits 4 and 11 and from offering explanatory evidence concerning them. But there was no offer of proof in this regard and, furthermore, she neither challenged nor offered rebuttal explanation to those questions and answers in exhibit 12 which were identical to the ones in

exhibits 4 and 11. She complains that the defendant's inept use of Peet's statements generated an impression that his testimony and statements were in complete conflict and that the necessary objections made by her counsel deepened this impression. If this was true her counsel's disclosure of the contents of the statements and the court's rereading of them dissipated the impression. She complains of those questions asked by the defendant prefaced by the phrase, "Is this a true statement?" (which was the form of the question used when the first attempt was made to impeach Peet by referring to exhibit 4) but the court sustained every objection to these questions.

██ The plaintiff complains that prejudicial error occurred when the court permitted the defendant to question Peet about refusing to give a statement on October 10, 1957. This arose when Peet said that representatives of the defendant asked for a statement on that date but he had refused to make one. The plaintiff cites Deeke v. Steffke Freight Co., 50 Ill App2d 1, 199 NE2d 442 (1964), in support of her contention. The Deeke case is not in point. In that case a defense witness declined to give a statement to the plaintiff. The plaintiff contended that his cross-examination as to this fact was unduly limited. The Appellate Court affirmed saying that a witness, at his discretion, has the right to refuse to talk to anyone. Unlike the witness in the Deeke case, Peet gave a statement but denied giving it. It was not error to question him about this, and to show that he was mistaken in saying he did not give a statement.

██ ██ The plaintiff complains that the trial court permitted the defendant to improperly cross-examine Peet for the sole purpose of impeaching him about matters not covered in his direct examination, such as whether the defendant changed the conditions at the scene subsequent to the accident by cleaning up debris, cutting weeds and painting the derail and the derail

sign. It is improper to examine a witness on immaterial matters for the purpose of contradicting his answers (People v. Kirkwood, 17 Ill2d 23, 160 NE2d 766 (1959)) but, in the first place, the plaintiff made no objection to these questions and, in the second place, not all of Peet's answers were inconsistent with his statements in exhibit 11, the exhibit upon which he was being examined. The latter view was shared by the plaintiff's attorney who, as he read this exhibit to the jury commented: "That is just what the boy said."

██ ██ The plaintiff further complains that the defendant sought to impeach Peet when there was no basis for the impeachment. Peet was asked (referring to exhibit 12) : "Was this question put to you and did you make this answer at that time:

" 'Q. Was there anything to obstruct the view of either the derail or the derail sign from your position on the motor car?

" 'A. The sun was shining in my eyes and I didn't see it.' "

The court overruled the objection that the answer was not inconsistent with Peet's testimony. The court's ruling was correct. Although Peet had testified that the sun obstructed his view he also had testified that the derail was the same color as the track, that the sign was almost unpainted and was not more than six inches above the surrounding weeds. If these conditions prevailed at the time of the accident it is likely that he would have said so four days later when he was asked if anything obstructed his view of the derail or the sign. If a witness fails to mention facts under circumstances which make it reasonably probable that he would mention them if true, the omission may be shown as an indirect inconsistency. Carroll v. Krause, 295 Ill App 552, 15 NE2d 323 (1938) ; Cleary, Handbook of Illinois Evidence, 2nd ed, § 9.7.

228

■ ■ The plaintiff complains that the trial court informed the jury that they would have exhibits 4 and 11 in the jury room and that he stated, in chambers, after the case had gone to the jury that the exhibits would go to the jury. The plaintiff argues that impeaching documents cannot be taken to the jury room, Nordhaus v. Marek, 317 Ill App 351, 45 NE2d 993 (1943); Nelson v. Northwestern El. R. Co., 170 Ill App 119 (1912). We agree with the plaintiff that the judge was mistaken when he made these statements but the plaintiff was not harmed by the mistakes because the documents did not go to the jury.

■ The plaintiff complains that the judge recalled the jury and read the statements to them. This is not a just complaint because her counsel stipulated that this could be done. Also unjustified is the complaint that the stipulation was forced on her counsel. The court did not confront her counsel with a "Hobson's choice" as is argued here. There was no ultimatum that the statements would go to the jury unless he agreed to the court's reading them. Rather, the record indicates that the court was persuaded by the attorney that it would be error to send them to the jury. After the court said that they would go to the jury room he asked to see the cases the plaintiff was citing. It was after the cases had been read that the court suggested the solution. The plaintiff and the defendant agreed to the suggestion which resolved a difficult situation and which was a fair solution to the procedural snarl for which they, more than the court, were responsible.

The plaintiff's final complaint is that the defendant's argument was prejudicial. Once again, an understanding of this complaint necessitates recounting the background of the argument and the context of the allegedly prejudicial remark. As we have mentioned there was a dispute whether the derail warning sign was obscured by weeds growing in its vicinity. A witness for the

plaintiff described these weeds as perennials, three to four feet tall, which were there from the year before, he said they were hemp weeds the tops of which break off for the winter but the stalks remain standing. The defendant presented a professor of botany from Iowa State University who was shown photographs taken the day after the accident of the area near the derail sign; he said the weeds visible in the pictures were not hemp, that hemp was an annual weed which grows from seed each spring, that the plant that made up the bulk of the discernible vegetation was an annual which when full grown would not reach a maximum height of more than 18 inches. In discussing these witnesses the attorney for the defendant remarked that the plaintiff's witness had said:

> ". . . that there were weeds four feet high around there. Four to four and a half feet high. He said that he never saw the derail and then he went further than that and I asked him what kind of weeds those were and he said. 'hemp weeds,' and to make it a little better he said they were second year growth. You could see where they had come out from the stalks and he said, 'You know, in the winter,' he said, 'just the tips fall off. Just the tips fall off, and then they grow out.' That is when we brought this professor in from Iowa, the botany man at Iowa, because that just isn't so.

> "He couldn't identify all the weeds in there because this is the early spring, June 5th, mind you, when most growth starts in May. This is June 5th, and he told you that most of these things hadn't progressed to the point where they are even identifiable. Some of them he could identify, but he did say there was no hemp in there.

"In other words, certain things you can recognize. Certain growths, you cannot. You might not be able to say what they are and he told you there wasn't any hemp in there.

"He said more than that. Hemp does not do that, does not grow from a stalk. He said that different hemp weeds come up from the ground each year. Now, you aren't going to get four feet, four and a half foot growth of any weed by June 5th.

"You know, this happened out there in Iowa and people in that area know the conditions there much better than we do. If the plaintiff in this case had a lawyer out there in Iowa you couldn't convince any group of residents around that area that there would be any four and a half foot weed growth."

The plaintiff's attorney objected to the last remark. The court sustained the objection and instructed the jury to disregard the statement. The defendant went on:

"You are asked to do that. You are asked to believe that there would be such a growth in this case."

The court sustained a second objection, struck the defendant's remark and again instructed the jury to disregard it.

 The plaintiff sees in these remarks a reflection on the propriety of her bringing her cause of action in the courts of Cook County and engaging a Chicago lawyer. She argues that she had a right under the law to have her case tried in Cook County and that the defendant should not have questioned this right before the jury, and that the right "could not be diluted by a plea to the jurors that the action was brought in Cook County since Iowa residents would not believe

certain facts." We believe the plaintiff's apprehensions are magnified beyond reason. The defendant's argument concerned Iowa weeds. While the remark about an Iowa lawyer was improper and the assertion that Iowa residents would know how high weeds would be early in June went beyond the evidence, the comments were relatively innocuous and the court promptly struck them and told the jury not to consider them. Even if the jury drew the farfetched inferences from the comments that the plaintiff does the court's decisive ruling removed any resulting injury. The plaintiff also complains of another part of the defendant's argument but we believe there is no merit to her complaint.

There was a solid evidentiary basis for the jury's verdict and neither the trial involvements nor the procedural deviation, nor the defendant's final argument deprived the plaintiff of a fair trial. The judgment of the Circuit Court is affirmed.

Affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.