THE STATE OF OHIO, APPELLEE, *v.* STEARNS, APPELLANT.

(No. 43675—Decided February 8, 1982.)

*Mr. John T. Corrigan,* prosecuting attorney, for appellee.

*Mr. Burl Owens,* for appellant.

MARKUS, J. Defendant appeals from his conviction in a jury trial of aggravated burglary and three counts of aggravated robbery. He argues that the trial court permitted improper examination of two state witnesses by the prosecutor, and that the verdict is against the manifest weight of the evidence.[1]

Although we do note certain irregularities in the examination of those two witnesses, we find that they were not sufficiently prejudicial to merit reversal. We further find that there was sufficient evidence to support the jury's verdicts.

The undisputed evidence at trial established that four adults and a six-year-old child were in a Cleveland apartment when a man armed with a gun forced them into closets, and that their personal belongings were then piled in the hallway to facilitate theft of those items. One of the adults escaped through a window to telephone police who arrived shortly thereafter while the felonious activity was still in progress. Defendant does not dispute that evidence demonstrated the occurrence of an aggravated burglary[2] and aggravated robbery[3] of three of the apartment occupants. Rather, defendant contests the claim that he was involved in those offenses.

Three of the adult occupants of the apartment and four police officers testified. The court's charge submitted the case to the jury with instructions about culpability for complicity.[4] Neither the defendant nor the alleged principal offender testified.

I

Two state witnesses were the adult male residents of the apartment. Both testified that they were in the apartment when the doorbell at the front apartment building door sounded. One of them went

---

[1] Defendant's two assignments of error claim:

"1. The trial court errored [*sic*] in disregard of the law, in granting the state's request to declare their witnesses hostile.

"2. The verdict is against the manifest weight of the evidence."

[2] R.C. 2911.11(A) provides in part:

"No person, by force, stealth, or deception, shall trespass in an occupied structure * * * with purpose to commit therein any theft offense * * * or any felony, when any of the following apply:

"* * *

"(2) The offender has a deadly weapon * * * on or about his person or under his control;

"(3) The occupied structure involved is the permanent or temporary habitation of any person, in which at the time any person is present or likely to be present."

[3] R.C. 2911.01(A) provides in part:

"No person, in attempting or committing a theft offense * * *, or in fleeing immediately after such attempt or offense, shall * * *:

"(1) Have a deadly weapon * * * on or about his person or under his control."

[4] R.C. 2923.03 provides in part:

"(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

"(1) Solicit or procure another to commit the offense;

"(2) Aid or abet another in committing the offense;

"* * *

"(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. * * *"

downstairs to that door, looked through a peephole in the door to see a familiar looking woman, and unlocked the front door to permit her entry. At that point the armed principal offender forced his way in with a gun pointed at the victim's head, directing the victim to return to the apartment ahead of him. Both of the male residents were then ordered into a closet at gunpoint. They each testified that they heard somewhat indistinct discussions between the principal offender and another, while they were being forced into the closet and after the closet door had been closed. Those reported discussions included threats against the occupants and the mutual theft efforts by the principal offender and that other person.

Both of these male residents denied an ability to identify the voice of the second offender; they even denied an ability to determine whether the second offender's voice was male or female. However, they both testified that they saw the defendant in their apartment immediately after being released from the closet, and that each of them then stated to the police that the defendant cooperated in the offenses. At trial, they explained that accusation on the basis of the defendant's unexplained presence in their apartment immediately after they were released from the closet. However, they denied any actual knowledge of the defendant's participation.

They each acknowledged that the defendant had been their personal friend for two or more years, that they had played basketball or chess together, that they knew the defendant's family, and that the defendant had visited their apartment on previous occasions.

On this appeal, defense counsel urges that the trial court erred by permitting the prosecutor to use leading questions during part of their respective examinations and to use prior statements given by each of them to the police, since they had been called as state witnesses. Although defense counsel asserts that some of these actions flowed from a side-bar ruling declaring these witnesses hostile to the prosecution, the record does not reflect any such request by the prosecutor or any such ruling to that effect. However, there were periodic objections to the form of questions and to the use of prior statements given by those witnesses to the police.

The control by the court of the mode of interrogation is governed by Evid. R. 611:

"RULE 611.  Mode and Order of Interrogation and Presentation

"(A)  Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

"* * *

"(C)  Leading questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."

We find no abuse by the trial court of its discretion in permitting the leading questions used for these two state witnesses.

In many instances, the leading questions were concerning preliminary matters which were not central to the controversy. To that extent, the court had authority to permit such examination in an effort "to avoid needless consumption of time." Evid. R. 611 (A)(2). However, some leading questions were allowed over objection on central issues. While the record does not contain an express ruling by the trial court that these two witnesses were hostile to the prosecution, defense

counsel acknowledge such a ruling was made and the record fails to show any abuse of discretion in treating these witnesses as "hostile" or "identified with an adverse party." Evid. R. 611 (C).

Even before the adoption of the Evidence Rules, leading questions were available to a party for his own witness, where that witness was hostile. *State v. Smith* (1977), 59 Ohio App. 2d 194 [13 O.O.3d 213]. Indeed, such questions were permitted to examine an unwilling witness, even though he is not actively hostile to the party calling him and has no adverse interest to that party. *Hurley v. State* (1888), 46 Ohio St. 320. When a witness demonstrates hostility during his examination by changing his testimony significantly from that which counsel had good reason to expect, he was traditionally subject to leading questions. *State v. Springer* (1956), 165 Ohio St. 182 [59 O.O. 241].

The Evidence Rules broadened the circumstances in which leading questions can be permitted, *inter alia,* by allowing their use for "a witness identified with an adverse party." Compare Evid. R. 611 (C) with former R.C. 2317.52. In this case, there was sufficient basis for the trial court to permit leading questions of these two state witnesses during direct examination, since the witnesses were shown to have a strong affinity to the defendant, they frequently gave incomplete or evasive answers, and they differed significantly from statements they had previously given to the prosecution. Ordinarily, the decision whether to allow such leading questions is left with the sound discretion of the trial judge who is in a better position to evaluate the attitudes manifested by the witnesses.

Defense counsel next argues that the court permitted improper impeachment by the prosecutor of these witnesses he had called. Contrary to former practice, Evid. R. 607 expressly authorizes the credibility of any witness to be attacked by any party, subject only to limitations on use of prior inconsistent statements to accomplish that impeachment.

"RULE 607. Who May Impeach

"The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Rules 801(D)(1)(a), 801(D)(2), or 803."

Thus, impeachment of a witness is available to challenge his credibility, *Rinaldi v. State* (App. 1932), 12 Ohio Law Abs. 602; to challenge his recollection or veracity, *Lee v. State* (1871), 21 Ohio St. 151; to demonstrate defects in his intelligence, *Shelby v. Clagett* (1889), 46 Ohio St. 549; to show limits on his knowledge about facts described in his testimony, *Savin v. Butler* (1924), 19 Ohio App. 68, affirmed (1924), 111 Ohio St. 695; to explore the thoroughness of his knowledge on matters to which he testified, *Hart v. State* (1932), 42 Ohio App. 501.

Impeachment of a witness is available to show his bias or prejudice. *United States v. Smith* (C.A. 5, 1977), 550 F.2d 277. His motive in testifying can be demonstrated. *State v. Nebe* (App. 1937), 26 Ohio Law Abs. 581. The unreliability of his testimony may be shown by demonstrating family relationships, *Mead v. McGraw* (1869), 19 Ohio St. 55; or by showing his interest in the outcome of the action, *Powell v. Powell* (1908), 78 Ohio St. 331; *Keveney v. State* (1923), 109 Ohio St. 64.

The limitation on impeachment of a party's own witness relates solely to use of prior inconsistent statements for that purpose. Evid. R. 607 permits the use of prior statements to impeach one's own witness "only upon a showing of surprise and affirmative damage." Before the adoption of the Evidence Rules, surprise may have been a sufficient basis to use prior statements in impeaching one's own

witness, without showing affirmative damage. *Hurley* v. *State, supra; State* v. *Johnson* (1960), 112 Ohio App. 124 [16 O.O.2d 51]. Surprise can be shown if the testimony is materially inconsistent with the prior written or oral statements and counsel did not have reason to believe the witness would recant when called to testify. *State* v. *Reed* (1981), 65 Ohio St. 2d 117 [19 O.O.3d 311]; *State* v. *Duffy* (1938), 134 Ohio St. 16 [11 O.O. 383]. Surprise may be sufficiently shown when the prior statement was silent on the subject of later testimony, if the failure to mention that subject in the statement reasonably implies lack of knowledge about that matter. *Esderts* v. *Chicago, R. I. & P. R.R.* (1966), 76 Ill. App. 2d 210, 222 N.E. 2d 117, certiorari denied (1967), 386 U.S. 993; *Erickson* v. *Erickson & Co.* (1942), 212 Minn. 119, 2 N.W. 2d 824.

In the present case there was sufficient basis for the trial court to accept the prosecutor's apparent claim of surprise, since the written statements by these two witnesses strongly implied direct knowledge of the defendant's participation and their trial testimony denied any such knowledge. Some question might have been raised whether the prosecutor knew that the witnesses had recanted their previous statements before he called them to testify. One of them stated late in his cross-examination by defense counsel that he had told a police officer the defendant was not involved, in a conversation outside the courtroom before this witness was called to testify. However, the record does not show that any such information was brought to the trial judge's attention by a *voir dire* examination before the prior statement was used, by an explicit objection to that effect, or otherwise. Evid. R. 103(A)(1) requires "a timely objection * * * stating the specific ground of objection, if the specific ground was not apparent from the context," in order to predicate error on any related ruling. In this case, the trial judge was justified in concluding that the prosecutor was sur-

prised by testimony significantly varying from the witnesses' prior written statements, absent a specific objection at that time to the prosecutor's alleged lack of surprise. Indeed, even when defense counsel developed evidence that the witness had recanted to a policeman outside the courtroom, during the late stages of that witness' cross-examination, no request was made to strike any reference to the allegedly prior inconsistent statement. Once again, any objection was waived by the failure to make such a timely motion to strike. Evid. R. 103(A)(1).

The second requirement for use of a prior statement to impeach one's own witness is a showing of affirmative damage. This is a new concept to Ohio law. There are no federal cases which would assist Ohio courts in applying that restriction, since Fed. R. Evid. 607 permits use of a prior inconsistent statement to impeach one's own witness, without limitations. It is a restriction applied by some other jurisdictions. See McCormick, Law of Evidence (2 Ed. Cleary Ed. 1972), at 76-77. Both the surprise and affirmative damage restrictions are apparently imposed to prevent counsel from circumventing the hearsay bar against communicating prior statements to the jury under the guise of impeachment. Without these limitations most prior statements could be read to the jury by calling their authors to testify.

"Affirmative damage" is explained in the Staff Note accompanying Evid. R. 607:

"Requiring a showing of affirmative damage is intended to eliminate an 'I don't remember' answer or a neutral answer by the witness as a basis for impeachment by a prior inconsistent statement."

The party's own witness must testify to facts that contradict, deny, or harm that party's trial position before the calling party can use the witness' prior inconsistent statement to impeach. Cf. *Mitchell*

v. *Swift & Co.* (C.A. 5, 1945), 151 F.2d 770.

To the extent that the two state witnesses denied knowledge or an opportunity to know about the defendant's participation in the offense, their testimony did not cause "affirmative damage." If the testimony of those two witnesses had gone no further, it would have been error to permit impeachment by their prior statements to stand. However, in the cross-examination of each witness by defense counsel, the witnesses stated that they heard the voice of the second participant in the crimes, that they were familiar with the defendant's voice, and that the voice of the other participant was not the defendant's. Any error in permitting the prosecutor to impeach testimony by his own witnesses that they did not know the other participant's identity was cured by the later testimony affirmatively denying the defendant's participation. If they had so testified initially, impeachment with the prior statements would have attacked affirmatively damaging statements. The order in which the testimony was adduced is not significant, so any original error became harmless beyond a reasonable doubt.

Further, the record does not show whether the prior statements were used to impeach or to refresh recollection. Defense counsel did not obtain, nor did he seek to obtain, clarification at trial of the purpose for which the statements were being used. Generally the recollection of a witness may be refreshed by directing his attention to a prior statement, so that the witness may correct testimony or explain an apparent inconsistency. *Hurley* v. *State, supra.* The extent to which a party may refresh the recollection of his own witness is ordinarily a matter for the trial court's discretion. *Gibson* v. *Johnson* (1941), 69 Ohio App. 19 [23 O.O. 339]; *State* v. *Durham* (1976), 49 Ohio App. 2d 231 [3 O.O.3d 280]. The trial court may permit counsel to read aloud portions of the witness' statement in order to refresh recollection, where the witness repeatedly claims lack of memory about those matters. *State* v. *Doherty* (1978), 56 Ohio App. 2d 112 [10 O.O.3d 133].

The transcript is ambiguous as to the use made of the prior statement. A proper foundation was laid for either use, since each of these witnesses was shown the statement, given a full opportunity to read it to himself, and then asked about only selected parts of the statement. The trial court sustained defendant's objection to the admission of the written statements as exhibits in evidence. Where the questions seem more accurately described as impeachment rather than refreshment, there was no additional objection by defense counsel to such specific questions. In view of the presumption of regularity, the burden of exemplifying the error more clearly rests upon the complaining party.

## II

Defendant's second assignment of error asserts that the evidence was not sufficient to justify his conviction. We disagree. The defendant was found standing in the ransacked apartment by the police officer that entered through a window while the crime was in progress. No satisfactory explanation for his presence was given by anyone. He was not there before the crime began. He was first seen by some of the apartment occupants when they were released from the closet where they had been placed by the principal offender. Several of those apartment occupants testified that the principal offender was assisted by at least one other person whose voice and movements were detected by them.

When the defendant was first confronted by the officer who interrupted the crime, the defendant claimed that he lived in the apartment. After that fact was denied by apartment occupants, he told the officer that he had come to purchase drugs and that the residents were angry

with him because he had failed to pay for them. No one corroborated that claim.

The outside apartment building door was locked when the principal offender first gained access by a subterfuge with an apparent woman accomplice. One of the apartment residents had to respond to the doorbell and physically unlock and open the door to permit that offender's entrance. The only other access route to this apartment described in the testimony was a window from which one of the apartment occupants jumped in order to call the police. The first officer that entered the apartment to interrupt the crime had to be boosted through that same window by another officer.

When the police first arrived at the scene, a woman was seated in a car in front of the building with the lights on and the motor running. After an officer spoke to that woman and removed the keys from that car, she ran from the scene and was never apprehended. The police found the front door to the building locked, so they too had to await someone from inside to unlock and open the door. After they seized the principal offender and secured the building to prevent ingress or egress by anyone else, the building was searched. No one was found whose presence could not be accounted for, except the defendant.

The defendant's previous visits to the apartment gave him knowledge of the apartment layout and the location of items worth stealing. The principal offender and the defendant had mutual acquaintances, so an inference was available that they knew each other. Considering all the direct and circumstantial evidence, including the somewhat uncertain denials of the defendant's participation by the male residents of the apartment, the jury had sufficient basis to reach its verdicts. We cannot say that those verdicts are against the manifest weight of the evidence.

For all of the above reasons, there is no merit to defendant's claimed errors, so the judgment of the trial court must be affirmed.

*Judgment affirmed.*

PRYATEL, C.J., and PARRINO, J., concur.