GENE GRIFFIN, Adm'r of the Estate of Annie Griffin, Deceased, Plaintiff-Appellant, v. ASWATH SUBRAM, Defendant-Appellee.

First District (2nd Division)   No. 1—91—2104

Opinion filed November 24, 1992.

Barsy, Joseph & Lichtenstein, of Chicago (Joel T. Daly, Burton Joseph, and Ross A. Keene, of counsel), for appellant.

Thomas & Buckley, of Chicago (Michael G. Thomas and Jean M. Buckley, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

This is an appeal from the jury verdict and judgment for defendant, Dr. Aswath Subram, and against plaintiff, Gene Griffin, administrator of the estate of his deceased wife, Annie Griffin (Griffin). Plaintiff's post-trial motion, seeking a new trial on all issues, was denied.

Plaintiff appeals. Although plaintiff raises several issues for review, we need address only two: namely, whether the circuit court erred by permitting the jury, during its deliberation, to examine an exhibit which was not in evidence, and whether the court erred in allowing defense counsel excessive leeway in questioning defendant after his adverse witness testimony.

On March 3, 1984, Griffin, age 37, was admitted to South Suburban Hospital, where she was examined by Dr. R. Singh, a neurosurgeon, who advised a laminectomy. This surgical procedure was performed by Dr. Singh on March 14, 1984, assisted by Dr. S. Kumar, a general surgeon, and Dr. R. Palaniappan, an anesthesiologist.

During the surgery, Griffin sustained a sudden and dramatic loss of blood pressure, frequently a symptom of massive internal bleeding. During the post-operative period, Griffin remained in shock, requiring transfusions of blood and other fluids. On March 15, 1984, the day after surgery, Dr. Kumar discovered a "murmur," a noise in the abdomen, which was further evidence of a vascular injury in that area. Dr. Subram was called in as a vascular specialist, to consult on Griffin's condition at 10:30 a.m., March 16, 1984. Dr. Subram found the patient in serious condition, in shock, with evidence that her liver and kidneys were failing.

Dr. Subram considered, among other possibilities, that the patient's deteriorating condition was the result of a vascular injury, suffered during surgery. He heard the murmur previously recorded by Dr. Kumar. He noted the findings of a hematologist indicating the "possibility" of internal bleeding, but did not order the recommended CAT scan to confirm the findings. He did not attempt or dictate surgical intervention to repair the injury at that time or at any time during the next 17 hours, until Griffin's death at 3:20 a.m., March 17, 1984.

Dr. Subram was of the opinion that Griffin could not withstand an operation until and if her coagulopathy, the ability of her blood to clot, was improved through further transfusions of blood and platelets. The level of platelets can be accelerated by using "packs," a concentration of platelets, but Dr. Subram did not administer such "packs" to Griffin until 9 p.m., nearly 12 hours after he first examined her.

Griffin arrested at 9:50 p.m. and was revived. Dr. Subram did not then consider taking her to surgery. Although he admitted that there are many instances in which a doctor would operate on a patient in less than optimal conditions in order to correct the source of the instability, Dr. Subram did not believe that was necessary in Griffin's case. He was of the opinion that, following the vascular injury, an arteriovenous fistula had formed. An "AV fistula," according to him, is

a temporary connection between an injured artery and vein which closes the circulatory system and prevents further massive bleeding. He admitted he never had performed surgery to correct an AV fistula. He did not consult with any other vascular surgeon.

Before trial, a settlement was reached between plaintiff and all parties named in the complaint, except for Dr. Subram.

Plaintiff moved *in limine* to preclude any testimony regarding the alleged negligence or medical malpractice of any other physician, person or institution, and sought to confine the issue at trial to what Dr. Subram did, or did not do, during the period of 10:30 a.m., March 16, 1984, to 3:20 a.m., March 17, 1984. The motion was denied. Plaintiff thereafter moved to reconsider, arguing that: (1) Dr. Subram could not rely on a defense that a third party previously or concurrently may have committed negligence; (2) allowing testimony that other physicians were also negligent invited the jury to improperly apportion loss and render a compromise verdict, contrary to Illinois law; and (3) any defense must rest on proof that Dr. Subram was free of negligence. The motion was denied.

The trial began March 6, 1991. During his opening statement, defense counsel introduced the theory of his case that Griffin's prior treating physicians, alone, violated the standard of care by failing immediately to detect, diagnose and repair the vascular injury which apparently occurred during the surgical procedure. Plaintiff's objections to a conclusion not based upon expert opinion and defendant's further speculation that the other doctors "didn't want to acknowledge" the presence of bleeding were overruled.

Dr. Subram was called by plaintiff as an adverse witness. Plaintiff questioned defendant with the frequent use of leading questions. When defense counsel questioned him, counsel continued the use of leading questions, as upon cross-examination. Plaintiff objected to the continued use of leading questions by the defense. Plaintiff was overruled, the court explaining that, in his view, since plaintiff had been permitted to lead the witness, defense counsel could do so as well.

Plaintiff also objected to defense counsel improperly eliciting from defendant opinions concerning areas of medicine in which he had no expertise; that were based upon previously undisclosed literature; and that were beyond the scope of the adverse examination. Plaintiff's request for a sidebar hearing, to consider the correctness of the court's ruling, was denied.

Dr. Philip Haid testified as plaintiff's expert. In his opinion, defendant violated the standard of care in the specialty of vascular surgery by failing to operate on Griffin in a timely manner to correct

the vascular injury which occurred during surgery. He believed the patient had a 60% chance of recovery with corrective surgery, but had no chance of survival without such a procedure. It was Dr. Haid's opinion that Griffin would have had a normal life expectancy had she survived the suggested corrective surgery.

During cross-examination of Dr. Haid, defense counsel introduced a compilation of figures, selected by counsel from Griffin's hospital records, in the form of a large chart. The chart was marked as defendant's exhibit No. 4, for identification. The figures on the chart represented the measure of patient's hemoglobin, hematocrit and platelets before, during and after surgery. Dr. Haid agreed that such figures were indicators of whether or not a patient is bleeding, but disagreed with the contention that the apparent stabilization of hemoglobin and hematocrit, following transfusions, meant that Griffin was not actively bleeding, or that an AV fistula had formed. Dr. Haid testified that the autopsy report showed no evidence of an AV fistula.

Dr. James Schuler testified as defendant's expert. He agreed with defendant's conclusion that an AV fistula had formed and was not, of itself, a major risk for the patient. Dr. Schuler based his opinion on the history of hematocrit values which had returned to a near-normal level, following transfusions of plasma and platelets. Dr. Schuler concurred with defendant's decision to postpone surgery because of the apparent bleeding disorder. On cross-examination, Dr. Schuler admitted that emergency surgery can be performed and such bleeding disorders overcome by rapid introduction of fresh plasma and platelets.

At the time the jury retired to deliberate, defendant sought to send to the jury several demonstrative exhibits highlighting portions of hospital reports. Plaintiff's objection that the exhibits were not in evidence and should be withheld from the jury was sustained, as follows:

"THE COURT: The objection will be sustained. The reason for it is apparently this is material taken from the hospital records and so forth. It's highlighting the small portion of the hospital records, and all you did was blow them up, and I don't think it would really help the jury determine the case. I think it will just highlight that particular thing which you possibly blew up."

While the jury was deliberating, however, the court received a message that the jury wanted to review defendant's exhibit No. 4, which the court previously had denied admittance in evidence and refused to submit to the jury. Defendant's exhibit No. 4 for identification is a 30-inch by 40-inch blowup of a chart compiled by defense

counsel, summarizing measures of hemoglobin, hematocrit and platelets over a number of days, before, during and after Griffin's surgery.

Without informing either plaintiff's or defendant's counsel of the jury's request, or summoning them to open court to respond to the jury's request, the court permitted the exhibit not in evidence to go to the jury room. The record reveals the following colloquy between court and counsel some time after the court did so:

> "THE COURT: The one thing I want to the put [*sic*] on the record before the jury comes back is that the jury did give me a note whereby they wanted one chart and the chart was regarding the, I guess hemoglobin and—
>
> [PLAINTIFF'S COUNSEL]: Hematocrits?
>
> THE COURT: Yes. And I sent them—I looked through the charts, since they wanted it and we had been talking about it in court, and I took, I believe it was the plaintiff's exhibit [*sic*] that had it which had been shown to the jury, and it would be the same as the transcript as far as the Court was concerned so the Court gave them that chart without the permission of either of the attorneys."

The jury soon thereafter found for defendant and against plaintiff.

Subsequently, plaintiff filed a post-trial motion, with an accompanying memorandum of law, seeking reversal of the verdict and a new trial. The motion identified alleged errors committed by the court on rulings of law and procedure. During argument, plaintiff's counsel emphasized the court's refusal to limit testimony concerning the alleged negligence of nonparties and permitting the jury to rely on an exhibit not in evidence, without notifying counsel or conducting a hearing in open court. Plaintiff's post-trial motion was denied.

## I

Plaintiff contends that, based on the facts outlined above, the court abused its discretion in denying his motion for a new trial.

Plaintiff argues that the circuit court erred by failing to notify the parties and conduct a hearing when the jury, during deliberation, requested a defense exhibit not in evidence. Plaintiff maintains that defendant's exhibit No. 4 for identification was manufactured by defense counsel from hospital records which were themselves hearsay documents not in evidence. Further, the chart was used in an attempt to impeach plaintiff's expert during cross-examination. As such, plaintiff insists, defendant's exhibit No. 4 can be considered only a demonstrative or argumentative device that does not rise to the level of reliability to allow it to be admitted into evidence, relying on *Esderts v.*

*Chicago, Rock Island & Pacific R.R. Co.* (1966), 76 Ill. App. 2d 210, 222 N.E.2d 117, *cert. denied* (1967), 386 U.S. 993, 18 L. Ed. 2d 339, 87 S. Ct. 1309, which held that written statements used for impeachment purposes may not go to the jury room.

Defendant counters that the exhibit was not manufactured but was intended to separate relevant from irrelevant information in Griffin's medical records. The information was arranged chronologically and reflected objective laboratory data for hemoglobin, hematocrit and platelet levels. The data were taken from a fairly substantial chart containing immeasurable other irrelevant data. Nothing relevant was deleted.

Defendant further claims that neither the information contained on the exhibit nor the interpretation accorded that information was in dispute and that the court has considerable discretion with respect to which exhibits can be taken to the jury room, relying upon *Wetherell v. Matson* (1977), 52 Ill. App. 3d 314, 318, 367 N.E.2d 472. In *Wetherell*, however, the questioned procedure involved X-ray films received in evidence, but not allowed to go to the jury room, the precise opposite to the facts in this case. That case was reversed on other grounds and remanded for a new trial.

Defendant also relies upon section 2—1107(d) of the Civil Practice Law, which provides:

> "Papers read or received in evidence, other than depositions, may be taken by the jury to the jury room for use during the jury's deliberation." (Ill. Rev. Stat. 1991, ch. 110, par. 2—1107(d).)

Defendant urges that because the statute is written in the disjunctive, "papers read or received in evidence *** may be taken *** to the jury room," this court may interpret that language and give it the requisite "plain and ordinary meaning." The exhibit was clearly a "paper read *** in evidence" and, consequently he suggests, it was within the circuit court's discretion to permit the exhibit to go to the jury room during deliberations.

■ Defendant's contention flies in the face of the circuit court's initial ruling, denying admission in evidence of the exhibit. One cannot do indirectly that which has been prohibited directly. Further, the challenged exhibit, used by the experts to explain the bases for their opinions, is not admissible as substantive evidence. There is a considerable difference between admitting medical records as evidence and recognizing medical records as the bases for expert opinion. In *Henry v. Brenner* (1985), 138 Ill. App. 3d 609, 486 N.E.2d 934, relied upon by defendant, the medical records were not allowed in evidence.

There the court explained the problems inherent in Federal Rules of Evidence 703 and 705, which do not create additional exceptions to the hearsay rule, but were designed to broaden the scope of expert testimony. They may not be used as vehicles for the admission of otherwise inadmissible evidence. This point also was made in *People v. Anderson* (1986), 113 Ill. 2d 1, 495 N.E.2d 485, which held that underlying facts or data may be offered not for their truth, but only for the limited purpose of explaining the basis for the expert's opinion. Further, as asserted in plaintiff's reply brief here, "[i]n most cases, the trial judge gives the jury a limiting instruction to that effect. That was not done in this case." See, *e.g., Brenner*, 138 Ill. App. 3d at 615.

Defendant nevertheless argues that the medical values summarized in his exhibit No. 4 were accurate, were not challenged, nor objected to by the plaintiff. It is true that no challenge or objection to its limited use to that point was made by plaintiff; however, the exhibit was never offered in evidence for the truth of its contents.

Defendant invites this court to review the evidence. This appeal is not brought under the *Pedrick* standard (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504), however, which would require this court to scrutinize the medical evidence. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 48, 463 N.E.2d 216.) Rather, this appeal charges an abuse of discretion by the circuit judge in refusing to grant a new trial on the basis of certain erroneous evidentiary and procedural rulings that prejudiced plaintiff's right to trial on the evidence. (*Mehochko v. Gold Seal Co.* (1966), 66 Ill. App. 2d 54, 213 N.E.2d 581.) The circuit court's action here in making the unilateral decision to provide the jury with the challenged exhibit in and of itself must be deemed reversible error. In this regard the supreme court in *People v. Beck* (1922), 305 Ill. 593, 598-99, 137 N.E. 454, made the following instructive observations:

> "All this the bill states occurred after the jury had retired and in the absence of the defendant and his counsel. It is not stated that the jury were brought into open court, but even if they were, the occurrence is not relieved of its objectionable features. Neither the defendant nor his counsel was present. No opportunity was given to object to the rulings of the court or to present instructions in behalf of the defendant or to ask for a modification of those given by the judge. The defendant and his counsel were excluded from participation in this part of the trial. So far as they were concerned the proceedings were se-

cret and *ex parte*, and their only information in regard to them was derived from hearsay after the event."

That the exhibit was prejudicial to plaintiff's case, standing as evidence without an opportunity for rebuttal had it been admitted, cannot be doubted. Defendant himself notes that it was "absolutely crucial" to his theory of the case. Once it is demonstrated, as here, that matter not in evidence was submitted for consideration by jurors, the burden shifts to the nonmoving party to demonstrate that there was no reasonable likelihood of prejudice; otherwise, prejudice is presumed and a motion for a new trial must be granted. (*Heaver v. Ward* (1979), 68 Ill. App. 3d 236, 242, 386 N.E.2d 134.) Defendant here does not show how the challenged exhibit was not prejudicial to plaintiff when, as defendant admits, the information contained in the exhibit was "absolutely crucial" to his theory of the case. It is on this point that *Lawson v. G.D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779, relied upon by defendant, must be distinguished. In *Lawson*, the court found that the irrelevant content of a government booklet, although detrimental to the plaintiff, was not crucial to the issues and, therefore, not prejudicial. Also, in *Lawson*, the booklet was received in evidence.

## II

Plaintiff next finds error in the court having allowed defense counsel to ask leading questions of Dr. Subram following plaintiff's examination under section 2—1102 of the Civil Practice Law (Ill. Rev. Stat. 1991, ch. 110, par. 2—1102 (section 2—1102)) and to attempt to establish his defense during this questioning.

▪ Under section 2—1102 plaintiff was permitted to examine Dr. Subram by asking leading questions. Thereafter, defense counsel questioned his client as though upon cross-examination. It is well settled that defense counsel in such a situation has the right to examine but not to cross-examine a defendant who has testified as an adverse witness under section 2—1102. The rule is set forth in *Edwards v. Martin* (1954), 2 Ill. App. 2d 34, 41, 117 N.E.2d 864:

"In numerous cases it has been held that a party called for examination under section 60 [now section 2—1102] of the Civil Practice Act does not become a witness of the adverse party calling him and he is, therefore, not subject to cross-examination as an ordinary witness. He may be examined by the opposing party only on matters to which he has testified upon the examination made by the party calling him. *Horner v. Bell*, 336

Ill. App. 581; *La Prise v. Carr-Leasing, Inc.*, 326 Ill. App. 514; *Combs v. Younge*, 281 Ill. App. 339."

See E. Cleary & M. Graham, Handbook of Illinois Evidence §607.4 (5th ed. 1990); R. Hunter, Trial Handbook for Illinois Lawyers, Civil §28.3 (6th ed. 1989).

It is also improper for a party, during examination of an adverse witness, to endeavor to elicit evidence which goes to establish his own case. (*Suich v. H. & B. Printing Machinery, Inc.* (1989), 185 Ill. App. 3d 863, 541 N.E.2d 1206.) The adverse examination of Dr. Subram by plaintiff focused on what he did or did not do during the time Griffin was under his care. Defense counsel, in his examination, questioned Dr. Subram on the events that occurred before he saw Griffin, including details of the laminectomy; massive bleeding; the procedure to be followed in the event of a vascular injury; and mortality of a patient who is not treated immediately. In *Darling II v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 319-20, 200 N.E.2d 149, 182, *aff'd* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204, the court held:

> "In that further examination, following the plaintiff's cross-examination under section 60 [now section 2—1102], the defendant might examine this witness as to matters tending to explain or qualify the testimony given on cross-examination, but not as to new matters not brought out on the cross-examination or as to matters constituting part of the defendant's defense; the scope of the further examination is largely in the discretion of the Trial Court, but it should not be so extended as to interject the defense into the plaintiff's case at that stage of the trial—the orderly procedure of a trial does not sanction that: *Horner v. Bell* (1949), 336 Ill. App. 581, 84 N.E.2d 672. The defendant's questions involved here were more properly related to matters constituting a part of the defendant's defense, rather than tending to explain or qualify the testimony given on cross[-]examination ***."

Other errors alleged need not be addressed in view of our disposition of this appeal.

For the reasons stated, this cause must be reversed and remanded for a new trial.

Reversed and remanded.

McCORMICK and DiVITO, JJ., concur.