OPINION
{¶ 1} In these consolidated appeals, appellants C.H. ("appellant"), and the Franklin County Public Defender, who is the guardian ad litem for appellant's daughter, appeal from the November 7, 2005 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which granted permanent custody of appellant's daughter, Baby C, to appellee, Franklin County Children Services ("FCCS"), for purposes of adoption.
 {¶ 2} The record reveals the following facts. Baby C was born on March 15, 2004. Her mother, appellant, was 16 years old when she gave birth to Baby C. The identity of Baby C's father has never been conclusively established. On May 7, 2004, FCCS filed a complaint, pursuant to R.C. 2151.04(C), alleging that Baby C was a dependent child. The complaint alleged that appellant had been removed from her mother's home due to issues of neglect and to domestic violence involving her older siblings; that two adult siblings had threatened to kill Baby C while Baby C was still in utero; that appellant had been placed with a relative, but left that home to stay with a friend because she had conflict with the relative; that appellant was unable to provide for Baby C due to her young age and lack of parenting skills; and that appellant had shown poor judgment in continuing to return to her mother's home, thereby placing Baby C at risk of harm.
 {¶ 3} Also on May 7, 2004, the court appointed the office of the Franklin County Public Defender as the guardian ad litem for Baby C. On May 18, 2004, counsel was appointed to represent appellant. On May 20, 2004, the court appointed a Court Appointed Special Advocate for appellant.
 {¶ 4} Following a hearing held before a magistrate on May 20, 2004, the magistrate adjudicated Baby C to be a dependent child. The magistrate granted temporary custody of Baby C to Chakesia Barnett, to whom custody of appellant had also been granted; and made a Temporary Order of Protective Supervision ("TOPS order"). The TOPS order required FCCS to investigate the home and needs of Baby C and to provide appropriate protective supervision. It also required all other parties to fully cooperate with the investigation, services and protective supervision.
 {¶ 5} On July 9, 2004, Ms. Barnett brought Baby C to FCCS because, according to Ms. Barnett, appellant had left Baby C with Ms. Barnett for one week without checking on her, appellant was not caring for Baby C properly, and she would become angry when Ms. Barnett forbade her to do such things as stay out late or take Baby C to appellant's mother's home as late as 3:00 a.m. FCCS accepted the baby from Ms. Barnett and placed Baby C in foster care.
 {¶ 6} On August 5, 2004, the magistrate held a dispositional hearing. Following this hearing, the magistrate issued an order finding Baby C to be a dependent child, awarding temporary custody of Baby C to FCCS, and adopting the case plan as an order of the court. On the same date, the court adopted the magistrate's decision.
 {¶ 7} The case plan required that appellant participate in a psychological evaluation; attend parenting classes; attend individual counseling; attend anger management classes; demonstrate during her visits with Baby C what she has learned at parenting and anger management classes and counseling sessions; demonstrate the ability to successfully nurture and care for Baby C; attend all scheduled visits with Baby C; obtain education regarding family planning options; gain and maintain employment or attend school with no attendance problems, and obtain appropriate housing.
 {¶ 8} On April 20, 2005, FCCS moved the court for a dispositional order committing Baby C to the permanent custody of the agency, pursuant to R.C. 2151.413, 2151.353(A)(4), and2151.414(B)(1)(a). The court held a hearing on FCCS' motion on October 3, 2005 and October 18, 2005. The following testimony was adduced at the hearing.
 {¶ 9} On the first day of the hearing, FCCS called appellant to testify as upon cross-examination. She testified that she was removed from her mother's custody when she was 15 years old, but returned shortly before her 17th birthday. She was still living with her mother, but testified that she planned to sign a lease the following day and move into the Woodland Meadows apartment complex two weeks hence. She also planned to apply for public assistance. She testified that she had "sometimes" been attending classes at Life Skills Community Center for three hours per day. She stated that she had signed up for distance learning high school courses, but had not yet paid the required fee.
 {¶ 10} Appellant told the court that she had been working at Wendy's for the past six to eight weeks. She worked six hours per day, five days per week. She stated that she did not know why she had not obtained a job until just before the hearing. She stated that if custody of Baby C were returned to her, appellant's mother would provide childcare while appellant worked.
 {¶ 11} Appellant testified that she had failed to complete individual counseling because she did not "get" what the counselor was saying. Therefore, she stopped attending after three sessions, and was thereafter terminated. She stated that she does not believe that counseling would help her. She denied that she has any problems managing anger. She admitted that she had failed to attend anger management classes, but said this was because she could not find any such programs that were not focused on male domestic abusers.
 {¶ 12} Appellant completed parenting classes. When asked to list the skills she learned during those classes, she stated that she had learned to be patient and calm. When asked if there were any other skills that she had learned, she answered, "no." When asked whether she has been able to exhibit her newly-learned patience and calmness during visits with Baby C, she replied, "[n]ow I do but at that time when she was a baby * * * the only thing she used to do is cry. If she don't see the foster mother the only thing she do is cry and cry and cry. I couldn't handle that." (Tr., 32.) When counsel for FCCS then inquired, "You couldn't handle a crying baby?" appellant answered, "No, I can't — you don't understand." (Id.) Counsel for FCCS then asked appellant whether she thought that Baby C, who by then was 18 months old, would still cry if returned to appellant's custody; appellant answered "No. She won't." (Tr., 33.)
 {¶ 13} Appellant testified that she attends two visits with Baby C per month. She attributed to work conflicts her missed visits in the two months immediately preceding trial. When asked the reason for missing other visits, she replied, "I don't know." (Tr., 34.) When asked to explain how she would be able to parent Baby C on a full-time basis, appellant gave an inaudible response.
 {¶ 14} She testified on direct examination on the second day of trial. She told the court that FCCS is no longer involved with her mother and siblings, and that she and all six of her siblings (with the exception of her older brother) had returned to live with their mother. She explained that parenting classes taught her how to care for a baby, including how to change and feed babies and "how to act around them." (Tr., 106.)
 {¶ 15} Appellant testified that the reason that she had not yet completed her case plan is that she thought she would have two years to work on it. She testified that she was not ready to have Baby C home with her because she still had some things to work on, such as completing counseling. However, she said that she is willing to do so.
 {¶ 16} After the case plan was first implemented, appellant attempted to work as a cashier at a sub shop and attend classes three hours per day at Life Skills. However, she was unable to do both, so she quit her job. She testified that her Life Skills training classes conflicted with visitation and counseling, so she dropped out of Life Skills. She took a full-time position at Wendy's six weeks before trial. She testified that she plans to re-enroll in Life Skills classes, but did not specify when she planned to do so.
 {¶ 17} Under cross-examination by counsel for FCCS, appellant reiterated that it was her school and counseling schedules that prevented her from maintaining her earlier job while also attending school; however, she could not explain how her schedule actually prevented this, given the fact that she had been terminated from counseling and attended Life Skills only sporadically. She admitted that she only worked at the sub shop for two to three months and then did not work until she obtained her job at Wendy's; she terminated counseling unsuccessfully on three separate occasions; and she was attending school at Life Skills only three hours per day on the days she attended, but she only attended about half the time. Counsel for FCCS then inquired, "What were you doing when you weren't attending school and not working and not going to counseling? What were you doing all day?" Appellant replied, "I have no answer." (Tr., 144.)
 {¶ 18} During her direct examination, appellant explained that she discontinued counseling sessions because she "didn't feel comfortable being around [the counselors] or I didn't feel comfortable talkin' to them or nothing." (Tr., 117.) She said that she would go back to counseling if she found a counselor with whom she feels comfortable. She testified that the reason she felt uncomfortable with the counselors she had seen was because the counselors were Caucasian, and she prefers to see an African-American counselor. On cross-examination, however, she admitted that she never asked for an African-American counselor and never told anyone that she would feel more comfortable with an African-American counselor. Later in her testimony on direct examination she added that she did not feel comfortable talking to the counselors because "I don't like expressing my feelings to people." (Tr., 134.)
 {¶ 19} Appellant attributed her sporadic attendance at visits with Baby C to her work schedule, but testified that she has changed her schedule so that she can attend visits. However, on cross-examination, she admitted that she had missed one of two scheduled visitation appointments with Baby C since the first day of trial two weeks earlier.
 {¶ 20} Appellant told the court that she cares for her sister's child every day and cares for the child of a friend twice per week. She stated that she feels more comfortable during visits with Baby C than she did earlier, and feels she can apply to her parenting of Baby C the skills she has learned in parenting classes and in caring for the two other children. She related that Baby C is not attached to her, but believes that there is a chance for Baby C to become attached to her if visitations were increased. She wants to increase visitation in order to have more of an opportunity to bond with Baby C. She stated that she believes that if visitations were increased, Baby C would be able to return to appellant's home in one month's time.
 {¶ 21} Appellant had testified on the first day of trial, roughly two weeks earlier, that she planned to move into her own apartment; but on cross-examination by the guardian ad litem on the second day of trial, she testified that she no longer desired to move into the Woodland Meadows apartment complex because of rampant crime. However, she still planned to complete the "CPO" program through Broad Street Management. The CPO program involves attending classes on topics such as keeping one's home clean and living within a budget, and moving into publicly assisted housing. She stated that if she moves out of her mother's home and into an apartment, she would place Baby C in day care either with her mother or with a day care center. However, she testified that she did not have any idea which day care centers she would seek out for Baby C. On direct examination appellant testified that she had not enrolled in the "CPO" housing program and classes earlier because one must be 18 years of age to enroll in the program. However, on cross-examination she admitted that she had not enrolled in the program until several months after her 18th birthday.
 {¶ 22} FCCS called caseworker Amber Spires ("Ms. Spires") to testify. She has been a caseworker with FCCS since March 2003 and was assigned to Baby C's case in April 2004. Ms. Spires testified that FCCS became involved with Baby C when Ms. Barnett dropped off the baby to FCCS' offices. Ms. Spires left a telephone message for appellant. When appellant called back, Ms. Spires inquired about Baby C, and appellant reported that the baby was "doing fine and that it was in her lap[.]" (Tr., 55-56.) Ms. Spires advised appellant that Baby C was in fact with FCCS, and that the agency would seek custody of Baby C in court.
 {¶ 23} Ms. Spires testified that the case plan required that appellant successfully complete individual counseling, parenting classes and anger management. The plan also required appellant to undergo a psychological evaluation, establish paternity of Baby C, secure appropriate housing, and either be employed or attending school. She was also required to attend visits with Baby C and to demonstrate during those visits the skills she acquired in parenting classes.
 {¶ 24} She testified that she discussed the case plan with appellant at length and also gave appellant what Ms. Spires called a "cheat sheet," which is a typed list of the things required of appellant. Ms. Spires testified that she provided appellant with referrals to parenting classes, counselors and anger management classes, and followed up with appellant to check on her progress. She provided appellant with three successive referrals to counselors, and reassured appellant that Ms. Spires would provide a note to appellant's teachers excusing her from class for counseling sessions. Appellant never completed counseling.
 {¶ 25} Ms. Spires also provided lists of anger management counseling providers, including those directed specifically toward women, but appellant never went to any of these programs. Ms. Spires testified that appellant completed a psychological evaluation and parenting classes. However, Ms. Spires also testified that appellant has not been able to demonstrate during visits any skills acquired at parenting classes. She further testified that appellant repeatedly stated that she wanted to establish her own residence. Ms. Spires offered to assist with finding an appropriate apartment and offered to help her acquire furniture and other household goods through Material Assistance Providers.
 {¶ 26} Ms. Spires testified that visitation has been scheduled for Wednesday mornings from 10:00 a.m. to 11:00 a.m. at FCCS offices on North Hamilton Road. The visits were supervised either by Ms. Spires or by a social service aide. Appellant missed about 50 percent of the scheduled visits that Ms. Spires was supervising. Ms. Spires offered to reschedule visits but appellant would often say she did not have time, she had to work or she did not have transportation. Ms. Spires said that she gave appellant bus passes but that appellant had never been particularly compliant with rescheduling of visits.
 {¶ 27} On July 12, 2004, Ms. Spires supervised a visit between appellant and Baby C, which was also attended by appellant's mother. During that visit, Ms. Spires had to tell appellant to pick Baby C up and hold her. When the baby began to be fussy, appellant became frustrated and gave the baby to appellant's mother. Despite Ms. Spires prompting her to do so, appellant never talked to Baby C during that visit. When the time to end the visit had arrived, Ms. Spires advised appellant that she could put Baby C in her car seat if she wished, whereupon appellant put Baby C in the seat, slammed the car seat down on the table and walked out of the room.
 {¶ 28} Ms. Spires testified that appellant has become verbally aggressive toward Ms. Spires on numerous occasions during conversations about the case plan. According to Ms. Spires, appellant raises her voice, slams things and stomps away when she becomes angry. She has also screamed profanity at Ms. Spires. For example, on May 6, 2005, during a telephone conversation, appellant inquired why Ms. Spires was trying to put Baby C up for adoption. Ms. Spires told her that she was not trying to do that, but that appellant had thus far only completed one required element of her case plan. When Ms. Spires confronted appellant with reports from Life Skills that differed from appellant's reports of her attendance at classes, she said, "it's fucking bullshit." Later, she again became frustrated, screamed that Ms. Spires was a "bitch" and then hung up the telephone. Ms. Spires testified about several other incidents in which appellant lost her temper and used profanity.
 {¶ 29} Ms. Spires testified that appellant has told her that she does not want Baby C and that Baby C should just stay in foster care. Ms. Spires testified that she was never able to successfully prompt appellant to talk to Baby C. Appellant would often hand the baby to the foster mother or to another person when the baby started to cry, and would never attempt to soothe her. Ms. Spires would prompt appellant to get down on the floor and play with Baby C, read to her, make her laugh, "do what a mom would do with a baby, just play with her and entertain her and try to enjoy the time * * * with her" (Tr., 91) but appellant "refused to sit on the floor and she just — she watched. She watched me interact with the child but she didn't interact with the child." (Tr., 92.)
 {¶ 30} On numerous occasions when appellant became frustrated with Baby C's crying, appellant told Ms. Spires that Baby C is spoiled and that the foster mother holds her too much and needs to let her cry more. According to Ms. Spires, Baby C exhibited no reaction to appellant leaving at the conclusion of visits. Ms. Spires described Baby C as being very happy during Ms. Spires' visits to the foster home. In contrast to her frequent crying during supervised visits with appellant, Baby C does not cry very much in her foster home. She squeals and plays, uses the new words she learns, and interacts with Ms. Spires and with the foster mother. When it is time for a nap, she lays down in her crib and waves "bye-bye" and goes right to sleep. Ms. Spires testified that the foster mother is a potential adoptive parent for Baby C.
 {¶ 31} FCCS also called Victoria Booth ("Ms. Booth") to testify. Ms. Booth was appellant's lay guardian from March 2004, when FCCS opened its abuse case that involved appellant and her siblings, through April 2005, when appellant turned 18 years old. Ms. Booth testified that she has observed appellant interacting with Baby C on several occasions. This interaction caused Ms. Booth concern because appellant "appeared to always let someone else take care of [Baby C] if she was crying or upset" and appellant "rarely held the baby when [Ms. Booth] was with her." (Tr., 53.) Ms. Booth told the court that appellant expressed to her that appellant did not feel it was necessary that she complete the case plan.
 {¶ 32} Next, FCCS called licensed social worker Jean Krebs ("Ms. Krebs") to testify. In May 2004 she was appointed as Baby C's lay guardian. Ms. Krebs related her observations of a visit between appellant and Baby C that occurred in March 2005. She stated that appellant did not communicate with Baby C and "the caseworker was doing a lot of prompting [appellant] as to what activities she should do, how to interact with the child. There was not a lot of interaction. The child would try to come out into the hallway to the foster mom." (Tr., 68.) Ms. Krebs testified that appellant did not attempt to persuade Baby C to come back to her, though the foster mother and Ms. Spires did make such attempts. On cross-examination, Ms. Krebs admitted that this was the only occasion upon which she met appellant.
 {¶ 33} FCCS also called Tamara Basile ("Ms. Basile") to testify. Ms. Basile has been Baby C's foster mother since July 2004. Ms. Basile did not attend approximately the first ten visits between appellant and Baby C. However, she testified, because "the visits weren't going well" Ms. Basile was asked to begin attending visits. Since that time, Ms. Basile has observed every one of appellant's visits with Baby C with the exception of one visit when Ms. Basile was ill. She testified that she stays in the room with appellant and Baby C most of the time, but she tries to step out for part of each visit to give appellant time alone with Baby C.
 {¶ 34} She testified that she attempted to reschedule weekend visits between appellant and Baby C on four separate occasions when appellant missed scheduled weekday visits. Of those four attempts, appellant agreed to schedule two. She attended one of these two rescheduled visits, which occurred at the Wendy's restaurant on Polaris Parkway in Columbus. This visit occurred sometime within the three months preceding the hearing.
 {¶ 35} On that occasion, appellant and her father had lunch with Ms. Basile while Baby C sat in a high chair. Ms. Basile related that appellant's father "did most of the talking" and appellant "didn't try to interact with the baby or speak with the baby or anything." (Tr., 76.) Ms. Steele inquired whether appellant "is passive during the visits and * * * doesn't do anything or does she actively do things that you think are bad for the baby or would endanger the baby?" (Tr., 77.) Ms. Basile replied:
No mom pretty much sits there, watches the baby. She will occasionally interact with the baby but very rarely — I have to pretty much prompt her to, you know, if the baby leaves the room, I'll say, "she left the room, go get her" — I haven't seen her do anything mean to the baby. I've never heard her speak to the baby. In all the time I've had the child she's never spoken to her. She's never hugged her. She's never kissed her or done any of those things.
(Id.)
 {¶ 36} The Franklin County Public Defender is the guardian ad litem for Baby C. Assistant Franklin County Public Defender Rebecca Steele ("Attorney Steele") is the attorney assigned to the case. FCCS called Attorney Steele to testify during its case-in-chief. Attorney Steele testified that she has never met Baby C because it was Ms. Krebs who had primary responsibility for the case. However, Attorney Steele remained assigned to the case and was available to consult with the lay guardian.
 {¶ 37} Attorney Steele has reviewed Baby C's placement history. When asked about her recommendation, she referred the court to her eighth report, which she had submitted to the court prior to trial. Attorney Steele testified that she "struggled" with the case because she did not feel that it would be in Baby C's best interest to be in appellant's custody, but also felt that appellant had "not had much of a chance" because she herself had been removed from her home and did not have a supportive family situation when Baby C was removed from her care.
 {¶ 38} Thus, Attorney Steele "went with a compromise * * * which was to advocate that the PCC not be granted at this time and that [appellant] be given more time to clarify what her commitment to the child is and her ability with the child." (Tr., 89.) During her address to the court at the close of FCCS' case, Attorney Steele stated that it is not surprising that Baby C and appellant have not formed a strong bond because Baby C was so young when she was removed from appellant's custody. This lack of bonding is the reason that she recommended that Baby C not be returned to appellant's home. However, she told the court that she believed there were "compelling reasons to extend rather than file the PCC [motion]." (Tr., 185.) She explained that because appellant is a first-time mother who herself was very young when she gave birth, appellant may have allowed her lack of confidence to affect how she behaved during visits with Baby C, and this contributed to the lack of bonding between the two.
 {¶ 39} Therefore, Attorney Steele recommended that the court deny the PCC motion and order that future visits with Baby C take place in appellant's home with the assistance of a home based worker. She opined that such "a concerted effort to address [the lack of bonding]" would allow all involved to "see whether the bond can be strengthened between the mother and the child." (Tr., 187.) She stated that, "I think both the law requires and my person[al] belief is as a guardian that we need to try to preserve biological families as best we can. And I did weigh the need for permanency and not allowing long terms [sic] foster care to go on as best we can with weighing what I felt to be in the child's best interest. And I felt that the PCC [motion] was premature." (Tr., 95.)
 {¶ 40} Appellant's mother, P.H. ("P.H.") testified on appellant's behalf. She testified that she believes that appellant sincerely wants to regain custody of Baby C. She also stated that she is willing to help appellant in completing her case plan, including allowing appellant to stay in P.H.'s home for as long as is needed. P.H. testified that appellant is appropriate with Baby C and with the babies that she cares for in P.H's home. She stated that appellant has matured and is now better at controlling her temper. P.H. works daily from 4:00 p.m until 9:00 p.m., and is willing to care for Baby C while appellant is at work. She explained that two of the reasons for appellant's missed visitation appointments are lack of transportation and appellant's father's recent illness. But she could not explain how she believed that appellant could be a full-time parent to Baby C when appellant could not ensure that she attended one one-hour visitation session per week.
 {¶ 41} By a judgment entry journalized on November 7, 2005, the court granted FCCS' motion. These appeals followed. In her appeal appellant advances three assignments of error, as follows:
1. The lower court's judgment was not supported by sufficient evidence and was against the manifest weight of the evidence.
2. The lower court erred as a matter of law in overruling Appellant [C.H.'s] Motion to Strike Testimony.
3. The lower court erred as a matter of law in failing to consider the report and recommendation of the Guardian ad Litem.
 {¶ 42} In its appeal, the guardian ad litem advances a single assignment of error as follows:
THE TRIAL COURT ERRED WHEN IT HELD THAT THE MINOR CHILD COULD NOT BE PLACED WITH HER MOTHER WITHIN A REASONABLE TIME AND THAT IT WAS IN THE BEST INTEREST OF THE CHILD TO PERMANENTLY SEVER THE MOTHER/CHILD RELATIONSHIP.
 {¶ 43} In her first assignment of error appellant argues that the court's judgment stands against the weight of the evidence and is not supported by sufficient evidence. FCCS sought permanent custody pursuant to R.C. 2151.414(B)(1)(a). Pursuant to that statutory provision, a court may grant permanent custody of a child to a public children services agency if the court determines at the hearing, by clear and convincing evidence, (1) that it is in the best interest of the child to grant permanent custody of the child to the agency, and (2) that the child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 44} Appellant contends that there was insufficient evidence to support the trial court's findings that it is in Baby C's best interest to grant permanent custody to FCCS, and that Baby C cannot be placed with appellant within a reasonable time or should not be placed with appellant. Appellant also argues that both of these findings are against the manifest weight of the evidence.
 {¶ 45} In order to terminate parental rights, the movant must prove, by clear and convincing evidence, one of the four factors enumerated in R.C. 2151.414(B)(1) and that the child's best interest is served by a grant of permanent custody to FCCS. Inre M.B., 10th Dist. No. 04AP-755, 2005-Ohio-986. Clear and convincing evidence requires that the proof "`produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" In re Estep (Feb. 8, 2001), 10th Dist. No. 00AP-623, 2001 Ohio App. LEXIS 435, at *4, quoting Inthe Matter of Coffman (Sept 7, 2000), 10th Dist. No. 99AP-1376, 2000 Ohio App. LEXIS 4033, citing Cross v. Ledford (1954),161 Ohio St. 469, 120 N.E.2d 118, at paragraph three of the syllabus.
 {¶ 46} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. In re Andy-Jones, 10th
Dist. No. 03AP-1167, 2004-Ohio-3312. Judgments supported by some competent, credible evidence going to all essential elements of the case are not against the manifest weight of the evidence.C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, 376 N.E.2d 578, paragraph one of the syllabus. The findings of a trial court are presumed correct since, as the trier of fact, it is in the best position to weigh the evidence and evaluate the testimony. In re Brown (1994), 98 Ohio App.3d 337,342, 648 N.E.2d 576; In re Hogle (June 27, 2000), 10th Dist. No. 99AP-944. Moreover, "every reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988), 38 Ohio St.3d 12,19, 526 N.E.2d 1350. "[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Ibid.
 {¶ 47} We begin by reviewing the trial court's finding that it is in Baby C's best interest for permanent custody to be granted to FCCS. In determining the best interest of the child, for purposes of a permanent custody motion, the court:
* * * shall consider all relevant factors, including, but not limited to, the following:
(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.[1]
R.C. 2151.414(D).
 {¶ 48} First, the trial court was required to consider Baby C's interaction and interrelationship with her mother, her relatives and her foster mother. Baby C's young age precludes direct inquiry of her with respect to her relationships with these individuals. However, all those who testified, including appellant, told the court that Baby C is bonded to Ms. Basile and is not attached to appellant. There was no testimony regarding Baby C's interactions and relationships with other family members. This factor thus weighs in favor of permanent custody.
 {¶ 49} Next, the trial court was required to consider the wishes of the child, as expressed through her guardian ad litem. Attorney Steele testified that she struggled with this case because although she did not feel that appellant should regain custody of Baby C at the time of trial, she felt that appellant may not have had sufficient opportunities, given her young age and the difficulties she faced in her own home situation, to demonstrate her ability and commitment to be a parent to Baby C, and to develop a bond with the child.
 {¶ 50} Thus, she recommended that the court deny FCCS' motion and increase visitation in order to give appellant an opportunity to develop a stronger bond with Baby C. But she cautioned the court that she cannot ensure that appellant will use increased visitation to forge a bond with Baby C. She said, "I don't have a crystal ball. I don't know. In six months if things don't improve I — I think I would be saying it is the time for the PCC * * *." (Tr., 187.) She felt that the permanent custody motion should be denied in favor of "a push for mother to spend more time with the baby for there to be, you know, kind of `do or die' period for mom." (Tr., at 90.)
 {¶ 51} The guardian ad litem was clearly concerned about appellant's lack of bonding with Baby C over the 18 months since Baby C was born, and was noncommittal as to whether appellant would be able to overcome this lack of a parent-child bond. Attorney Steele acknowledged that appellant was not in a position to take custody of Baby C at the time of trial, but wished to give appellant a "do or die" period or, put another way, one last chance. However, she did not tell the court that she felt that Baby C could in fact be placed with appellant within a reasonable time or should be placed with appellant. For these reasons, though Attorney Steele recommended that the court deny the agency's motion, her testimony, taken as a whole, weighs only slightly in appellant's favor.
 {¶ 52} Next, the court was required to take into account the custodial history of the child. The evidence clearly demonstrated that Baby C has been in foster care continuously since the age of four months. This factor weighs against appellant.
 {¶ 53} Next, the court was required to consider Baby C's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. "Without doubt, every child needs a legally secure placement. The question is whether or not the parent can provide such a placement." In re J.S., 10th Dist. No. 05AP-615, 2006-Ohio-702, ¶ 27.
 {¶ 54} In this case, the trial court found that a legally secure placement could not be achieved without a grant of permanent custody to FCCS. Sufficient competent, credible evidence supports this conclusion. All parties agreed that appellant is not ready to be a parent to Baby C at this time, and there was no evidence sufficient to support a firm belief that Baby C could be securely placed with appellant. The evidence revealed that appellant's intentions regarding housing, schooling, employment, day care, and pursuit of counseling are vacillating and unstable at best, and, at worst, sometimes nonexistent. Furthermore, no other party, such as a family member or close family friend, requested temporary custody of Baby C while appellant continued work on her case plan. This factor weighs in favor of an order of permanent custody.
 {¶ 55} Upon review of the evidence adduced on the issue, we find that the trial court properly determined that it is in Baby C's best interest to grant permanent custody to FCCS. The finding was supported by sufficient evidence and was not against the manifest weight of the evidence.
 {¶ 56} We now turn to the trial court's determination that Baby C cannot be placed with appellant within a reasonable time or should not be placed with appellant. "In determining at a hearing held pursuant to division (A) of [R.C. 2151.414] * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of [R.C. 2151.414] * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
* * *
(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
* * *
(16) Any other factor the court considers relevant.
R.C. 2151.414(E).
 {¶ 57} In this case, the court found, by clear and convincing evidence, that, "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. The mother is now age 18, as of April 12, 2005, but shows no motivation to meet the child's needs." (Judgment Entry, at 5.) The court noted specifically that appellant has, "failed to remedy the problems of lack of interaction and interrelationship with the child and very unlikely ability to nurture and stimulate the child, and * * * failed continuously and repeatedly to do so although services were offered and referrals made." (Id. at 4.)
 {¶ 58} The court also found that appellant "has failed to demonstrate commitment to the child, interact with the child, talk and coo with the child." (Id. at 5.) The court also found relevant appellant's "lack of use of visitation to demonstrate her motivation to care for the child. The visits have shown mother's lack of present and reasonable time [in the] * * * future [to] meet the needs of the child." (Id.) The court found that although appellant has completed parenting classes, has a job and lives with her mother, she has failed to complete counseling, anger management and visitation time, and has failed to "show an interest in interaction with the child[.]" (Id.) Based upon all of these findings, the court determined that Baby C cannot be placed with appellant within a reasonable time or should not be placed with appellant.
 {¶ 59} In our view, this determination was amply supported by sufficient evidence and was not against the manifest weight of the evidence. It is undisputed that appellant has failed to complete counseling and has failed to attend anger management classes. Though she and her mother testified that she is better able now to control her anger, Ms. Spires testified that appellant continues to demonstrate an inability to control her anger, including when she is with Baby C. Appellant testified that she does not have an anger management problem; thus, no remedy for her anger problem appears likely in the foreseeable future.
 {¶ 60} Appellant has continuously failed to take advantage of the opportunity to forge a bond with Baby C that was offered to her through scheduled weekly visitation. She has failed to attend many visits and, when she has attended, has consistently neglected to take the initiative to interact with Baby C in any way approximating the interaction required between an infant and its mother. Appellant and Ms. Steele advocated that visitation be increased in order to facilitate the establishment of a bond; appellant, curiously, felt that such a bond could be established within one month's time, while Ms. Steele could not predict without "a crystal ball" whether any bond would be established. We, like the trial court, fail to see how a bond could be established in order to allow return of Baby C to appellant within a reasonable time, given appellant's significant lack of compliance with the visitation- and parenting-related aspects of the case plan.
 {¶ 61} Appellant obtained a job only six weeks prior to trial, and though she repeatedly maintained that she was on the cusp of re-enrolling in school, obtaining her own apartment and applying for public assistance, she never managed to do any of those things throughout the case planning period and up to and through the time of trial.
 {¶ 62} Upon a review of all of the evidence, we find that the trial court correctly determined that appellant has failed continuously and repeatedly to substantially remedy the conditions causing Baby C to be placed outside her home. Pursuant to R.C. 2151.414(E), the court was thus required to find that Baby C cannot be placed with appellant within a reasonable time or should not be placed with her.
 {¶ 63} For all of the foregoing reasons, appellant's first assignment of error is overruled.
 {¶ 64} In its sole assignment of error, the guardian ad litem argues that the trial court erred in finding that Baby C could not be placed with appellant within a reasonable time and that an order of permanent custody in favor of FCCS was in Baby C's best interest.
 {¶ 65} The guardian ad litem characterizes the issues in this case as relating solely to appellant's immaturity, and argues that because appellant will mature over time, and in the absence of "evidence of a likely and imminent adoption * * * time is no longer critical," the court should not have granted appellee's motion. The guardian goes on to state, "[i]n the absence of any proof that an adoption was imminent or probable, there was no need to sever the mother/child relationship[.]" (Brief of Guardian ad Litem, at 8.) The guardian also argues, "[u]nless there is some evidence presented that an adoptive placement is likely or is probable if the agency gets permanent custody, there is generally little need, in the best interests of the child, to terminate the legal ties to the parents." (Id. at 6.)
 {¶ 66} The guardian ad litem misstates the statutory and decisional law that governs this case. Nothing in R.C.2151.414(D) requires or even suggests that the court take into account a child's prospects for adoption in determining whether a permanent custody order is in that child's best interest. We have previously so held in the case of In re A.S., 10th Dist. No. 05AP-351, 2005-Ohio-5492, ¶ 6. Moreover, this was not a case in which the trial court believed that FCCS could find another person who would be better able to raise Baby C. The court found that return of Baby C to appellant would not be in Baby C's best interest, and the evidence amply supported this conclusion.
 {¶ 67} Finally, we reject the notion that unless the agency can prove that it has an adoptive family "waiting in the wings," so to speak, then a child who is abused, neglected or dependent must languish in foster care while successive, futile case planning efforts are made.
 {¶ 68} For all of the foregoing reasons, we overrule the single assignment of error advanced by the guardian ad litem.
 {¶ 69} In her second assignment of error, appellant argues that the court erred in failing to strike testimony from Ms. Spires for which the witness needed the aid of documents called "ROAs," which stands for "Report of Activity." Appellant argues that appellee failed to lay the appropriate foundation for the testimony, either as a present recollection refreshed under Evid.R. 612, or as a past recollection recorded under Evid.R. 803(5). Appellant initially objected to the testimony and the objection was sustained. Appellant made her motion to strike at the conclusion of the witness' testimony, but the court overruled the motion. Appellant argues that, though the trial court sustained her initial objection to this testimony, the court erroneously "continued to allow the witness to read her testimony" and "allowed the testimony from the ROAs and not from the witness herself."
 {¶ 70} In response, appellee argues that it did lay the proper foundation for Ms. Spires' testimony under Evid.R. 612. In the alternative, appellee argues that if appellant still did not believe that a proper foundation had been laid, then it should have moved to strike the testimony on a question-by-question basis, and should not have waited until the conclusion of the testimony to request that the court strike it in its entirety. Finally, appellee argues that any portions of her testimony that Ms. Spires read from an ROA are admissible under Evid.R. 803(5) as past recollections recorded.
 {¶ 71} Evid.R. 612, which deals with the usage of a writing to refresh the memory of a witness provides that:
Except as otherwise provided in criminal proceedings by Rule 16(B)(1)(g) and 16(C)(1)(d) of Ohio Rules of Criminal Procedure, if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.
 {¶ 72} In order to refresh the recollection of a witness per Evid.R. 612, a three-part test must be met: (1) the memory of the witness must be exhausted or nearly exhausted, State v. Price
(1980), 60 Ohio St.2d 136, 398 N.E.2d 772; Weis v. Weis (1947),147 Ohio St. 416, 72 N.E.2d 245; (2) the writing does refresh the recollection of the witness, Moots v. State (1871),21 Ohio St. 653; and (3) the opposing party is provided an opportunity to inspect the writing and further cross-examine the witness with regard to the writing, State v. Taylor (1947), 83 Ohio App. 76, 38 O.O. 150, 77 N.E.2d 279. In addition, "the extent to which a party may refresh the recollection of his own witness is ordinarily a matter for the trial court's discretion." State v.Stearns (1982), 7 Ohio App.3d 11, 16, 7 OBR 12, 454 N.E.2d 139.
 {¶ 73} Additionally, Evid.R. 803(5), which deals with "past recollection recorded" provides that:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * *
(5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown by the testimony of the witness to have been made or adopted when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.
 {¶ 74} The admission of a written document pursuant Evid. R. 803(5) is permissible when: (1) the writing concerns a matter which the witness once had personal knowledge; (2) the writing was prepared when the matter was fresh in the memory of the witness; and (3) the witness has no independent recollection of the matter. State v. Scott (1972), 31 Ohio St.2d 1, 60 O.O.2d 1, 285 N.E.2d 344; United States v. Williams (C.A.6, 1978),571 F.2d 344.
 {¶ 75} In the present case, appellee began to introduce a line of questioning regarding a June 6, 2004 telephone call memorialized in an ROA, and commenced this area of questioning by asking Ms. Spires to describe ROAs. She testified that an ROA is generated each time that a caseworker has contact with a "client," including every telephone call and every visit. Each caseworker turns in ROAs to his or her supervisor on a daily basis, and the ROAs are put into the corresponding case file. Ms. Spires testified that she can ascertain that she generated an ROA by observing her signature at the bottom of the entry.
 {¶ 76} When Ms. Spires began testifying as to the events detailed in the first set of ROAs, dated June 6, 2004 and June 7, 2004, appellant objected on the ground that no foundation had been laid under either Evid.R. 612 or 803(5). The judge asked the witness whether she was testifying from her independent memory or whether she was essentially reading from the ROA. She replied, "I guess both in that. If you asked me what day something happened I can't recall the conversation that happened on that date but as I read it, yes, I remember that conversation." (Tr., 52.) Questioning resumed regarding that set of ROAs, and appellant made no further objection to the testimony.
 {¶ 77} When appellee moved on to question Ms. Spires about a July 12, 2004 visit, counsel for the agency inquired whether she recalled the events or whether she needed to read the corresponding ROA from the agency file. Ms. Spires replied, "When I refer to this R.O.A. I definitely remember that day and I remember that visit. There's no way for me to remember details of every visit and every R.O.A. for every case. I mean, I do have to look at and — when you refer to the date — to remember what day that happened." (Tr., 58.) Ms. Spires then proceeded to describe the supervised visit memorialized in the ROA, with no objection from appellant except one hearsay-based objection.
 {¶ 78} Appellee then inquired about a January 11, 2005 telephone conversation with appellant. Appellee's counsel asked whether Ms. Spires recalled what happened or whether she needed to rely upon what was written in the ROA to give her testimony. Ms. Spires stated, "I will need it to refresh my memory based on the date." (Tr., at 62.) Then, she proceeded to describe a telephone conversation that she had with appellant. This testimony drew no objection. With respect to the next ROA, Ms. Spires testified, "If I refer to [the ROA] then I will remember the circumstances." (Tr., at 66.) She then proceeded to testify at length regarding another telephone conversation she had with appellant, which testimony drew no objection.
 {¶ 79} With respect to a November 17, 2004 ROA, Ms. Spires stated, "I will recall when I check it." (Tr., at 72.) After she reviewed the ROA, she proceeded to testify about a supervised visit attended by appellant and appellant's father. Though Ms. Spires once referred to appellant as "02" and to Baby C as "03" during this testimony (which is, apparently, the way in which parties are coded on ROAs) appellant did not object.
 {¶ 80} When Ms. Spires was asked whether she recalled the events memorialized in the next set of ROAs or whether she needed to rely on reading the ROAs to give her testimony, she replied, "I just need to review it and then I'll remember." (Tr., at 75.) She then proceeded to testify about another telephone conversation she had with appellant, and this testimony drew no objection as to the foundation for a present recollection refreshed. With respect to the next ROA, Ms. Spires stated, "I'll recall. I just need to review it." (Tr., at 84.) She proceeded to testify regarding another telephone conversation with appellant, and this testimony drew no objection.
 {¶ 81} Later, when asked whether she supervised a visit on September 22, 2004, she asked to review the corresponding ROA. When asked whether she recalled the events of that date, she responded, "I will recall after I review it." She reviewed the document, and then proceeded to testify that appellant and her father were present at that visit.
 {¶ 82} Following an interruption for an objection unrelated to the witness' memory, appellee's counsel said, "I just want you to describe the visit." (Id. at 87.) The witness began by stating, "It says caseworker was present and so that was me. And it — the — it says FP stayed as well ____[.]" (Id.) At this point, appellant's counsel interrupted, saying, "I'm sorry, Your Honor, to keep objecting but she she's reading now and she just got through testifying that [she] recalls the visit. And I would ask that she speak as to her personal knowledge from her own recollection since she remembers it rather than read." (Id.)
 {¶ 83} The judge turned to the witness and asked, "Which are you doing?" She replied, "I — when I read this I remember that day. When you say 9/22/04, I don't remember what happened that day. I have to kind of look and I'm like, "Oh, yeah, I remember that day. I remember what happened." (Id.)
 {¶ 84} The judge then instructed the witness to clarify whether she actually remembered this particular event or whether she did not remember and needed to read the ROA into the record. The witness then responded, "Let me read the entire thing. I hadn't read the entire thing sitting here. So, let me read the entire thing and then I — I will remember that day and probably have more details even that [sic] are in the R.O.A. Is that okay?" The judge replied "Yes." Immediately thereafter, the witness resumed her testimony by saying, "Okay. I do remember this day very well. This was one of the best visits we ever had." (Id.) Ms. Spires went on to testify at great length about the events that occurred at that visit, with no further objection from appellant.
 {¶ 85} When appellee's counsel asked whether the witness recalled a visit that took place on March 8, 2005, Ms. Spires replied, "Let me read this paragraph [of the corresponding ROA] and then I will. Okay. This is a visit where * * *." (Tr., 91.) Appellant did not object to this testimony. When appellee's counsel asked about a visit that took place on March 16, 2005, she inquired, "Do you recall this visit or are you planning on reading the R.O.A.?" Ms. Spires replied, "I recall the visit. I need to read it to refresh my memory. I think it was a birthday visit. It was. I remember her birthday visit very well. I reserved the big room. [C.H.] brought — I let [C.H.] bring peep[sic] — other people to this visit which we don't typically do but, you know, this wasn't a day where we were, you know, going to be sticklers about who was there. I just wanted people to come. I wanted [C.H.] to be there for her kid — her child's first birthday and, you know, enjoy it." (Tr., 92-93.) She continued to describe the visit at length. Appellant did not object.
 {¶ 86} When appellee asked about a visit that took place on March 23, 2005, Ms. Spires stated, "I need to read the R.O.A. to refresh my memory of this visit. Well, * * * [C.H.'s] dad was with her at this visit. This was a bad visit." (Tr., 94.) Ms. Spires went on to describe the events of the day in detail, and drew no objection. During the remainder of her testimony, Ms. Spires also told the court that she needed to refresh her memory of visits that occurred on April 6, 2005, and May 3, 2005, with no objection from appellant.
 {¶ 87} Following cross-examination, redirect examination and re-cross-examination of this witness, appellant's counsel told the court that he felt that no proper foundation had been laid under either Evid.R. 612 or 803(5) and said, "I'm asking the Court to strike her direct testimony, those questions that were results of the improper use of the rules." (Tr., 49.) The court puzzled aloud as to how the court was to know which questions counsel wanted stricken. After an additional colloquy between the court and counsel for both parties, the court overruled the motion.
 {¶ 88} Though this case by no means represents the ideal manner in which to lay the foundation for a witness' present recollection refreshed by a document, pursuant to Evid.R. 612, we think that the record indicates that the foundation was sufficiently laid. Each time the witness testified about transactions memorialized in an ROA, she testified that she needed to review the ROA to connect a particular date to a particular event, and that she indeed possessed a present recollection of the details of the event. The testimony that followed does not appear to have been read verbatim from any document.
 {¶ 89} On the only occasion upon which the record indicates that the witness began reading from the ROA, there was an objection, after which the court intervened and ascertained that the witness had rushed into answering without completely reading the document. Once she did so, she resumed testimony, apparently without reading the ROA verbatim, and no further objection was interposed.
 {¶ 90} Even if the court erred in refusing to strike portions of Ms. Spires' direct testimony, the error was harmless. See Inre Harris (Mar. 20, 2001), 10th Dist. No. 00AP-987; In reM.H., 8th Dist. No. 80620, 2002-Ohio-2968, ¶ 79; Civ.R. 61.
 {¶ 91} The vast majority of Ms. Spires' testimony regarding specific visits and telephone conversations related to appellant's lack of interaction with Baby C and appellant's inability to control her anger toward Ms. Spires. The trial court relied upon Baby C's lack of bonding and attachment to appellant when it made certain of its findings; however, appellant's lack of interaction with Baby C entered the record through other portions of Ms. Spires' testimony, as well as through the testimony of Ms. Basile, Ms. Krebs and Ms. Booth. Moreover, both Ms. Steele and appellant herself testified to Baby C's lack of bonding and attachment to appellant. Thus, any error in admitting portions of Ms. Spires' testimony relating to appellant's lack of interaction with Baby C was harmless.
 {¶ 92} Additionally, the trial court made no mention whatsoever in its judgment entry of the fact that appellant continues to display an inability to control her anger. Thus, any erroneously admitted testimony from Ms. Spires recalling appellant's verbal abuse of Ms. Spires was also harmless.
 {¶ 93} For all of these reasons, we find appellant's second assignment of error to be without merit and we overrule it.
 {¶ 94} In her third and final assignment of error, appellant argues that the court erred in "failing to consider the report and recommendation of the guardian ad litem." More specifically, she argues that the court should not have ruled against the recommendation of the guardian ad litem without evidence to contradict Ms. Steele's position. We disagree.
 {¶ 95} First, there is no statute or controlling authority, and appellant does not cite any authority, that requires the trial court to rule in accordance with a recommendation from a guardian ad litem unless other evidence specifically contradicts that recommendation. Moreover, though Ms. Steele "struggled" with her recommendation and finally decided to suggest that the court deny the agency's motion in favor of increased visitation, she herself could not predict and would not opine whether such increased visitation would yield any appreciable results. Finally, as discussed earlier, there was ample evidence supporting the court's findings. For these reasons, appellant's third assignment of error is overruled.
 {¶ 96} Having overruled the single assignment of error advanced by the guardian ad litem, and all of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.
Judgment affirmed.
Klatt, P.J., and Bryant, J., concur.
[1] It is undisputed that none of the these factors apply in the present case.